Amelia **BARRETO RIVERA,**
et al., **Plaintiffs,**

v.

**Luis R. MEDINA, et al., Defendants.**

**Civil No. 96–1518(JP).**

United States District Court,
D. Puerto Rico.

Nov. 25, 1997.

Juan Carlos Cancio–Reichard, Aguadilla, PR, for Plaintiffs.

John F. Nevares, Smith & Nevares, San Juan, PR, for Defendants.

### *OPINION AND ORDER*

PIERAS, District Judge.

## I. INTRODUCTION

The Court has before it Defendants' Motion for Summary Judgment (**docket No. 33**), Plaintiffs' Opposition (**docket No. 34**), Defendants' Reply (**docket No. 36**), and Plaintiff's Sur–Reply (**docket No. 37**). Plaintiffs brings this claim alleging Defendants violated 42 U.S.C. §§ 1983 and 1988 when Plaintiffs' father, Arístides Ortega–Barreto ("Ortega") was shot and killed by Defendant Police Officer Luis R. Medina–Vargas ("Medina"). The Court found that the only Plaintiffs with standing to sue under §§ 1983 and 1988 were the decedent's two minor sons, Arístides Junior Ortega Soto and Albin Rey Ortega Soto, both represented by their mother, Luz María Soto Quiñones in her capacity as their legal guardian.

## II. UNCONTESTED FACTS

Ortega and Medina, the protagonists of the shooting incident in question, both lived and interacted in the same neighborhood of Montebello in Manatí, Puerto Rico. Several weeks before the incident, Medina had an encounter with Ortega's wife's, Edna Adams–Martinó ("Adams"). According to Adams' statement:

"... I was going to the house of a friend of my husband's, who is a mechanic, to get a part for my car. When I was returning, Officer Medina is going along [and] sees the mechanic get out of my car in front of his house... I encounter Officer Medina standing outside the patrol car and he orders me to stop. I stop and he tells me, "You know that guy does not have a license," this referring to the mechanic. I told him that he was doing me a favor of getting me a part for my car. Medina [] said to me, "If I see him driving your car again I am going to file a complaint against you for authorizing a person to drive without a license." [] I told him that I would not again give my car to the mechanic for him to drive it... I also recall that at that time Medina also said these words to me: *"If I see you like that again our friendship will not be the same as before."* I did not have any friendship with Medina, only that I would greet him whenever I saw him and *because he would pass time with my husband.* Then one week after this[,] Medina went by my house and I was inside my car with my two boys, because I was going to go out, and he made an expression with his mouth like when you are going to blow someone a kiss but I don't know whether he did it to my boys or me, but he fixed his look on me. I had noticed Medina *being somewhat strange and I had already told my husband."*

(Sworn Statement of Adams) (emphasis added).

On April 28, 1995, at approximately 5:30 p.m., Ortega was returning from a neighborhood store in his car and was signaled to stop his car by a police car, with no apparent reason. Ortega continued driving and the patrol car followed. (Sworn Statement by José Trinidad Soria, store owner). Wilfredo Sánchez–Pabón, who was in the car with Ortega, said in his sworn statement that they reached Ortega's home and parked the car. Medina parked behind them, came out, and said to Ortega, "come here; I want to talk to you," and demanded Ortega's driver's license and vehicle registration. Ortega answered that he had the vehicle registration, but did not have a license. (Sworn Statements of

eyewitnesses W. Sánchez–Pabón and J. Igraín–Pabón). A heated argument ensued, with both men cursing at each other. (Sworn Statements of eyewitnesses W. Sánchez–Pabón, J. Igraín–Pabón, and H. Serrano–Casanova). Ortega then told Medina "you got fresh or made a pass at my wife." Medina answered, "you are fresher because you are an abuser," and Ortega retorted "you are fresher because you have abused many old folks around here." (Deposition of Luis Antonio Ortega–Colón at 6). Several punches were thrown and neighbors intervened and separated the combatants, and Ortega was brought into his house. Ortega's elderly mother and uncle then confronted Medina, who shoved them both. Ortega saw this, grabbed a metal tube, and tried to reenter the fray. (Sworn statements of J. Igraín and H. Serrano and Depositions of Juan Santiago–Miranda, A. Brito, L. Ortega–Colón, and Oscar Rolando Rivera).

At this stage, Medina called on his police radio, stating excitedly that he was being assaulted by someone with a tube and that he was going to have to shoot him. Police Lieutenant José Francisco Cruz–Feliciano told Medina to calm down and that help was on the way. (Sworn Statements of Lieutenant Cruz–Feliciano, Sergeant Edgardo Camacho–Meléndez, Officer Wilfredo Oquendo–Vázquez, and eyewitness H. Serrano). Ortega then dropped the metal tube and approached Medina with his hands raised and empty, telling Medina to put away his gun and for them to fight it out with their fists like men. (Depositions of J. Santiago, A. Brito, L. Ortega, and O. Rolando Rivera). Medina, pointing his weapon, told Ortega not to come any closer or he would shoot him. (Depositions of A. Brito and O. Rolando Rivera and Sworn Statement of H. Serrano). Ortega continued to approach empty-handed towards Medina, who then shot Ortega once in the stomach. (Deposition of A. Brito and Sworn Statement of H. Serrano). After Ortega collapsed to the ground, some bystanders told Medina he had killed him and Medina answered that if Ortega got up he would shoot him again. (Sworn Statements of W. Sánchez and J. Igraín). Ortega was pronounced dead at the hospital.

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides:

"[Summary judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The purpose of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Generally, in addressing a motion for summary judgment, the Court tracks the following course. First, the court must identify material factual disputes, which are determined by reference to the substantive law: "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The Court then draws all reasonable inferences in favor of the party against whom summary judgment is sought. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir.1987); *but see Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (a court need not credit "conclusory allegations, improbable inferences, and unsupported speculation"). To accomplish this where the issue would be for the jury at trial and is one for which the movant would bear the burden of proof, the movant must show that, given the undisputed facts, no reasonable jury could find that the movant had failed to establish all required elements of that issue. *See, Anderson* 477 U.S. at 248, 106 S.Ct. at 2510. Where the issue would be for the jury at trial but, as here, is one for which the non-moving party would bear the burden of proof, the movant must show "that there is

an absence of evidence to support the non-moving party's case." *Celotex Corp., 477 U.S.* at 325, 106 S.Ct. at 2553. In other words, when the moving party does not ·bear the burden of proof, it must establish that no reasonable jury could find that the non-movant has established the requisite elements of its claim. If the moving party has not met its respective summary judgment burden, the motion should be denied. Finally, where the moving party has met its initial burden of proof, the burden shifts to the non-moving party to show that some triable issue, whether factual or legal, remains unresolved. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553 (1986). If it succeeds, the motion must be denied; if it does not, the motion will be granted.

When faced with a motion for summary judgment, a district court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed.R.Civ.P. 56(c). "In addition, a court may take into account any material that would be admissible or usable at trial ... [but] inadmissible evidence may not be considered." *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993). Moreover, "mere allegations, or conjecture unsupported in the record, are insufficient to raise a genuine issue of material fact." *Id.* (citing *August v. Offices Unlimited, Inc.,* 981 F.2d 576, 580 (1st Cir.1992)).

## IV. DISCUSSION

▉▉▉ Plaintiffs' claim under § 1983 has been levied against Police Commissioner Pedro Toledo–Dávila. Officer Medina never appeared or answered the complaint, and the Court entered default against him on January 14, 1997. The only defendant remaining is Toledo–Dávila. In a claim under § 1983,

"a state official ... can be held liable for the behavior of his or her subordinates if (1) the behavior of such subordinates results in a constitutional violation and (2) the official's action or inaction was "affirmative[ly] link[ed]," *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985), to that behavior in the sense that it could be characterized as "supervisory encouragement,

condonation, or acquiescence" *or* "gross negligence, amounting to deliberate indifference."

*Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988). There are two essential elements under the first requirement: "that the conduct complained of has been committed under color of state law, and ... that this conduct worked a denial of rights secured by the Constitution or laws of the United States." *Martinez v. Colon,* 54 F.3d 980, 984 (1st Cir.1995)(quoting *Chongris v. Board of Appeals,* 811 F.2d 36, 40 (1st Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)). To act under color of law, "it is not enough for an individual merely to purport to exercise official power in order to trigger § 1983 liability, but rather the individual must actually be engaged in the abuse of official power granted by the government." *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 449 (1st Cir.1997). The key issue confronting the Court is whether the police officer's acts were of a personal nature or whether he was acting under color of law. *Id.* To make this determination, the Court must consider the evidence of the police officer's action "in light of the totality of surrounding circumstances." *Martinez,* 54 F.3d at 987. Such factors include whether the officer was in uniform, on-duty or on-shift, using his service weapon, the location of the incident, and the totality of the surrounding circumstances. *Parrilla–Burgos,* 108 F.3d at 449. These factors are not controlling, but are taken into account together with the entire circumstances of the incident in .question and all the factors surrounding the situation.

▉▉▉ In *Parrilla–Burgos,* the plaintiffs argued that the policeman acted under color of law because "but for his official authority, he could·never have done what he did." *Id.* The First Circuit found:

that some language in *Martinez* might appear to support such an expansive position. See· 54 F.3d at 986 ("In general, section 1983 is not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved in that way but for

the authority of his office."). However, that statement merely articulates the minimum threshold that must be met for action to be considered as occurring under color of state law and does not set forth the specific test to be applied in determining whether a challenged act was committed under color of state law. In fact, in *Martinez* we rejected such a sweeping standard for § 1983 liability. See, e.g. id. at 987 ("[W]e must assess the nature of his conduct in light of the totality of the surrounding circumstances...."), 988 ("'While a police officer's use of a state-issue weapon in the pursuit of private activities will have "furthered" the § 1983 violation in a literal sense,' a court needs 'additional indicia of state authority to conclude that the officer acted under color of state law."')... We will not jettison our settled case law to embrace such a broad standard of liability here."

*Parrilla–Burgos*, 108 F.3d at 449. The plaintiffs in *Parrilla–Burgos* "point to the following factors to justify § 1983 liability: the twenty-four hour a day regulation [that police in Puerto Rico are 'on-duty' 24 hours a day and must always carry their badge and service weapon]; [the officer's] repeated statements that he was a police officer; his use of his service revolver in the shooting; his statements to patrons that he was there to 'keep the peace' and that he was 'handling the situation'; and his display of his police identification." *Id.* at 450. Nonetheless, the Court found that the officer was not acting under color of state law. In the case at bar, Medina initiated the fatal encounter with Ortega long before that date when he made a pass at Ortega's wife. Medina was in uniform, on shift, armed with his service weapon, in his police vehicle, and he followed Ortega home, asking him for his license and registration as a pretext for his intervention. The Court reemphasizes that these factors are not controlling and need to be taken into account with the entire circumstances of the incident and all the factors surrounding the situation.

The true purpose of the confrontation between Medina and Ortega was personal and not official in nature. The relationship had been personal long before the incident that ended with Ortega's death. Medina's true purpose in creating the encounter became obvious when Ortega accused Medina of making a pass at his wife. Medina's prior actions towards Ortega's wife are indicative of the personal nature of his relationship with Ortega and his intentions when he intervened with him. Medina had been acting strangely around Ortega's wife, to the effect that he was requesting sexual and love favors from her. The love feud which was the cause of Medina's intervention then became evident. Ortega at one point tells Medina "you got fresh or made a pass at my wife." Medina retorts, "you are fresher because you are an abuser," which would mean that Ortega allegedly abused his wife. We reach this conclusion because they were talking about Medina's conduct towards her and the retort's reference is to Ortega's behavior towards her. This exchange also shows Medina's intimate knowledge of Ortega's very private relationship with his wife.

In *Parrilla–Burgos*, the First Circuit found that the police officer's acts "under pretense of law by purporting to act in his official capacity ... w[ere] belied by the rest of [his] behavior, especially his repeated assertions that he could do things such as "look dirty" at [the decedent] because he was a police officer." 108 F.3d at 450. The brief pretense the officer may have made to be acting in his official capacity by showing his identification and stating he was keeping the peace ended when the two agreed to fight it out." *Id.* In the case at bar, Medina's pretextual official act of requesting Ortega's license and registration was overcome by the prior occurrence of Medina's love overture towards Ortega's wife, which Ortega knew of, and the subsequent fight that led to the shooting.

Plaintiffs also argue that the Court should interpret the fact that Medina called for police back-up as evidence that he was still acting under color of law. On its own, such a call could constitute an act in official capacity, but not taking into account all the facts. After making the call, Medina did not make any pretense of acting officially or under color of law. He was certainly scared to the point that after initiating the personal con-

frontation with Ortega, he realized that Ortega and his family were not intimidated. He called for assistance but did not retreat, attempt to defuse the situation, or calm down as he was instructed by the police lieutenant. Medina may have made the call in order to shoot Ortega and argue self-defense, knowing Ortega's volatility. Indeed, Medina never tried to arrest, subdue, or handcuff Ortega, but instead only threatened to shoot him.

An additional factor to consider is the decedent's attitude towards the police officer and any consideration the former gave to the latter's official status. In *Parrilla–Burgos,* "any possibility that [the decedent] was intimidated by [the police officer's] claims of official status were belied by the undisputed fact that [he] invited [the officer] to engage in a private brawl." *Id.* at 450–51. Quoting the District Court's decision, the First Circuit stated:

> "[the decedent's] reaction in the face of [the *officer's*] openly hostile behavior towards him serves to buttress our conclusion that [the officer's] actions constituted private conduct outside the line of duty, and that the latter's status as an officer did not enter into his taunting of the decedent. The particular interaction between [officer and decedent] was of a distinctly personal nature, and [the decedent] unquestionably realized as much. The fact that [he] not only initiated the confrontation, but subsequently invited [the officer] to "fight it out" outside the bar shows that he was not so intimidated by [the officer's] status as a policeman "as to cause him to refrain from exercising his legal rights." "

*Id.* at 451.

In the case at bar, Ortega's reaction to Medina's pointing a gun in his direction was not that of a citizen confronting a police officer, but rather, as in *Parrilla–Burgos,* that of a participant in a private brawl. After taunting and cursing each other, Ortega continued to approach Medina, telling him to drop the gun and for them to fight it out with their fists like men. Medina told Ortega not to come any closer or he would shoot him. Ortega continued to approach the armed man, demanding they fight. These are not the acts of a person heeding another's status

as a policeman; instead, they reflect Ortega's total disregard for Medina's official position. Ortega did not behave as if Medina was acting under color of law and no evidence has been presented that Medina made any further pretense of official action. In fact, Medina's actions after shooting Ortega were those of a victorious and remorseless fighter, saying that if Ortega got up he would shoot him again. These are not the acts of a police officer who had been forced to shoot a civilian during the course of official police duties. They clearly show an individual who despised his adversary.

## V. CONCLUSION

The case at issue is not an incident of a police act under official authority; it is the story of a man who felt unrequited love, hate, and jealousy towards the husband of a woman he wanted. The facts of this case apply even more appropriately to the legal standard and teaching established in *Parrilla–Burgos* than the facts of that case itself. In *Parrilla–Burgos,* there was no prior relationship between the policeman and the civilian; they did not know each other or have any reason to feel animosity towards each other; and there was no prior *animus furandi* or any other prior intent of a violent nature. In the case at bar, Medina and Ortega's family were neighbors and they knew and interacted with each other. Their prior relationship had an element that is traditionally the source of great anguish; the sentiment Shakespeare referred to as:

> "How all the other passions fleet to air, As doubtful thoughts, and rash despair, And shuddering fear, and green-ey'd jealousy."

*The Merchant of Venice* III, ii, 108. The previous relationship between the parties overshadowed the fact that Medina was onshift, in uniform, and carrying his service weapon. The "green-ey'd" monster of jealousy, which was mutual between Medina and Ortega, had taken over for some time and was the underlying personal relation between them. As in *Parrilla–Burgos,* the deceased was unarmed, challenged the policeman to fight, and approached empty-handed. These were not acts that occur between a civilian and a policeman; they were acts of a person-

al nature, in which the pent-up emotions of one man raged against those of another who wanted to have his wife and vice versa. These covetous thoughts were in Medina's mind when he followed Ortega to his home. Medina's appearance, in turn, sparked Ortega's accusation that Medina had made a pass at his wife, and led to the argument that brought about Ortega's death. These acts were the result of a situation that had been brewing for weeks and the facts are demonstrative of conduct that had nothing to do with the exercising of official duties and everything to do with a quarrel between two men fighting over a woman.

The confrontation between Medina and Ortega was one of a purely personal nature, and therefore, no reasonable jury could find that Medina was acting under color of law when he shot Ortega. As a constitutional violation by a state official's subordinate can only occur if the act was committed under color of law, there is no cause of action against Police Superintendent Pedro Toledo-Dávila. Plaintiffs' claim against Medina also fails, since as an element of any § 1983 claim, Plaintiff must establish Defendant acted under color of state law. The Court found that Medina was not acting under color of state law and, therefore, Plaintiffs' § 1983 claim against Officer Medina cannot succeed.

For the foregoing reasons, the Court hereby **GRANTS** Defendants' motion for summary judgment and **DISMISSES** Plaintiffs' complaint under § 1983 **WITH PREJUDICE**.

**IT IS SO ORDERED.**