Amelia **BARRETO–RIVERA, et al., Plaintiffs, Appellants,**

v.

**Luis R. MEDINA–VARGAS, et al., Defendants, Appellees.**

No. 98–1222.

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1998.

Decided Feb. 18, 1999.

43

Raul S. Mariani Franco with whom Carlos M. Hernandez Lopez, Juan C. Cancio Reichard, and Cancio & Cancio Reichard were on brief for appellants.

John F. Nevares with whom Lizzie M. Portela and Smith & Nevares were on brief for appellees.

Before STAHL, LIPEZ, Circuit Judges, and REAVLEY,* Senior Circuit Judge.

LIPEZ, Circuit Judge.

Plaintiffs, relatives of decedent Arístides Ortega–Barreto ("Ortega–Barreto"), brought suit under 42 U.S.C. § 1983 against defendants Luis Medina–Vargas ("Officer Medina–Vargas"), a police officer of the Commonwealth of Puerto Rico, and his supervisor at the Puerto Rico Police Department, Superintendent Pedro Toledo–Dávila ("Toledo–Dávila"). Plaintiffs alleged that Officer Medina–Vargas, acting under color of state law, used excessive force to shoot and kill Ortega–Barreto. The district court disagreed and granted summary judgment in favor of defendants, concluding that the fight between the two men that led to Ortega–Barreto's death was personal in nature and thus Officer Medina–Vargas was not acting under color of state law when he shot Ortega–Barreto. After a careful review· of the record, we conclude that there are genuine issues of material fact that preclude the entry of summary judgment. Accordingly, we vacate the judgment and remand for further proceedings.

## I. Background

We recite the facts in a light most favorable to the nonmoving party, making all reasonable inferences in that party's favor. *See Martinez v. Colon*, 54 F.3d 980, 980 (1st Cir.1995). On April 28, 1995, Ortega–Barreto left his house and went to a local store to purchase cigarettes and beverages. As Ortega–Barreto drove home from the store, Officer Medina–Vargas followed Ortega–Barreto in his police cruiser and attempted to force Ortega–Barreto to pull his car over to the side of the road. Ortega–Barreto refused to stop his vehicle and Officer Medina–Vargas chased Ortega–Barreto back to his house. Officer Medina–Vargas parked behind Ortega–Barreto and said, "Come here, I want to talk to you." He then demanded Ortega–Barreto's driver's license and vehicle registration. Ortega–Barreto told him that he had the vehicle registration, but he did not have a license. An argument ensued and the men shouted profanities at each other. Ortega–Barreto told Officer Medina–Vargas, "You got fresh or made a pass at my wife," to which Officer Medina–Vargas responded, "You are fresher because you have abused many old folks around here." The two men began to throw punches at each other and Officer Medina–Vargas repeatedly hit Ortega–Barreto with his night stick. The men were separated and Ortega–Barreto retreated into his house.

At that point, Ortega–Barreto's uncle and mother approached Officer Medina–Vargas. Officer Medina–Vargas pushed Ortega–Barreto's uncle to the ground and shoved his mother. Upon seeing his family assaulted, Ortega–Barreto left his house, went into his yard and picked up a piece of plastic tube. He started toward Officer Medina–Vargas with the tube in his hand. Although several witnesses were able to take the tube from him, Ortega–Barreto continued to approach Officer Medina–Vargas. As Ortega–Barreto approached, Officer Medina–Vargas radioed for back up stating: "10–50, I have been attacked. Hurry up, this guy is acting tough and I am going to have to shoot him." Police Lieutenant Jose Francisco Cruz–Feliciano told Officer Medina–Vargas to calm down and that help was on the way. Ortega–Barreto, standing approximately six to eight feet from Officer Medina–Vargas, told Officer Medina–Vargas to drop his gun and to fight with his fists. Officer Medina–Vargas instructed Ortega–Barreto not to come any closer or he would shoot. Ortega–Barreto continued to approach, empty handed, and Officer Medina–Vargas shot him in the stomach. Ortega–Barreto fell to the ground. Bystanders yelled at Officer Medina–Vargas that he had killed Ortega–Barreto. Officer Medina–Vargas responded that if Ortega–Barreto got up, he would shoot him again. Ortega–Barreto was pronounced dead at the hospital.

On April 26, 1996, plaintiffs filed a complaint under 42 U.S.C. § 1983 in the United States District Court for the District of Puérto Rico alleging that Officer Medina–Vargas's conduct violated Ortega–Barreto's

---

* Of the Fifth Circuit, sitting by designation.

civil and constitutional rights. The complaint further alleged that Superintendent Toledo–Dávila was liable for Officer Medina–Vargas's conduct because he failed to control, supervise and discipline Officer Medina–Vargas despite Toledo–Dávila's knowledge of Officer Medina–Vargas's disciplinary problems. Officer Medina–Vargas failed to answer the complaint and a default judgment was entered against him on January 14, 1997. The case then proceeded against Superintendent Toledo–Dávila on the claim of supervisory liability. Toledo–Dávila filed a motion for summary judgment, arguing that Officer Medina–Vargas's actions were not under color of state law and thus no supervisory liability could be attributed to Toledo–Dávila under 42 U.S.C. § 1983. The motion was granted by the court on November 24, 1997, and plaintiffs' complaint was dismissed. This appeal followed.

As noted above, there was a default judgment entered against Officer Medina–Vargas. Nevertheless, to determine whether Superintendent Toledo–Dávila could be liable under a theory of supervisory liability, we must first determine if there are genuine issues of material fact relating to whether Officer Medina–Vargas was acting under color of law when he shot and killed Ortega–Barreto. Only then do we reach the issue of whether there are also genuine issues of material fact relating to Toledo–Dávila's responsibility for Officer Medina–Vargas's conduct.

## II. Discussion

 Federal Rule of Civil Procedure 56(c) permits a court to enter summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Our review is de novo and we evaluate the record in a light most favorable to the nonmoving party, "in-

dulging all reasonable inferences in that party's favor." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994). Although we will not credit unsupported speculation, "the nonmoving party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him....'" *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 935 (1st Cir.1987)(quoting *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)). Put another way, in evaluating a motion for summary judgment, we must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. Liability under 42 U.S.C. § 1983

 To state a claim under section 1983, a plaintiff must allege two elements: 1) that the conduct complained of has been committed under color of state law, and 2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States. *See Martinez v. Colon,* 54 F.3d 980, 984 (1st Cir.1995).[1] In analyzing the first element in this case—namely, whether the conduct of the police officer involved private violence or violence attributable to state action—we have warned that courts must avoid simplistic solutions. *See id.* at 986. No single, easily determinable factor will control whether a police officer was acting under color of state law. *See id.* While certain factors will clearly be relevant—for example, a police officer's garb, an officer's duty status, the officer's use of a service revolver, and the location of the incident—these factors must not be assessed mechanically. *See id.* at 986–87; *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir.1997).

---

1. Puerto Rico's status is the functional equivalent to statehood with regard to section 1983 and thus the phrase under color of state law includes Puerto Rico law. *See Martinez v. Colon,* 54 F.3d at 984 (1st Cir.1995); *see also Playboy Enters.,* *Inc. v. Public Serv. Comm'n of Puerto Rico,* 906 F.2d 25, 31 n. 8 (1st Cir.1990)(stating that "this Circuit considers Puerto Rico a 'State' within the meaning of section 1983").

In *Martinez*, we explained that "whether a police officer is acting under color of state law turns on the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Martinez*, 54 F.3d at 986. Such an evaluation requires an assessment of the totality of the surrounding circumstances, *see id.* at 987, and "[t]he key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law," *id.* at 986. In applying these principles to the facts at issue in *Martinez*, we concluded that an on-shift officer who shot and maimed a fellow officer was engaged in a "personal frolic" and not acting under color of state law. *Id.* at 987. The on-shift officer relentlessly harassed Martinez over a period of time, verbally abusing him, pointing his gun first at Martinez's stomach and then later at his groin, taunting him and asking Martinez if he was scared. Throughout these encounters, the officer never asserted his authority as a police officer. We concluded that he "was bent on a singularly personal frolic: tormenting an acquaintance." *Id.* In the case of an officer against officer dispute, the limited indicia of state action, i.e., use of his police weapon, his on-shift status and his uniform, were not enough to establish that the officer "exercise[d], or purport[ed] to exercise, any power (real or pretended) possessed by virtue of state law.... Though on duty and in uniform, [the officer's] status as a police officer simply did not enter into his benighted harassment of his fellow officer." *Id.*

More recently, in *Parrilla–Burgos*, we again addressed the parameters of police conduct allegedly carried out under color of state law. *Parrilla–Burgos*, 108 F.3d 445. A police officer shot and killed a bar patron during a fight outside of the bar. *See id.* at 446–47. The officer was on medical leave and, although he was not in uniform, he was carrying his police identification and service revolver.[2] The officer went to the bar with a group of friends where he encountered the decedent. *See id.* at 446. Threats were

made and the officer told decedent: "I'll look at you whichever way I please, because I am a cop." The situation escalated and again the officer told decedent that, "I look at anybody I want, because I am a cop. Anybody I decide I want to look at dirty, I look at them dirty." *Id.* at 447. A crowd gathered around the men and apparently the officer showed his identification and told the crowd that he was there to keep the peace. Although this act controlled the situation for a few minutes, tensions increased shortly thereafter. *See id.* While still in the bar, the decedent challenged the officer and stated, "Well, you leave the gun and me and you will have it out, outside." The officer responded, "I don't need a gun to fight you. Come on, step outside." The men did step outside, but the officer brought his gun. Almost immediately, as they began to fight, the officer pulled out his weapon and shot the decedent six times. *See id.* On the basis of these facts, we concluded that, even though some factors weighed in favor of finding that the officer was acting under pretense of law by purporting to act in his official capacity, i.e., comments that the officer was in the bar to keep the peace and his display of his identification, most of the officer's conduct demonstrated that he was acting in a private capacity. *See Parrilla–Burgos*, 108 F.3d at 450–51. We noted in particular that in the final moments of the confrontation, the victim invited the officer to engage in a private brawl and there was no further pretense of official action. *See id.*

## B. Application of the Standards

In concluding that Officer Medina–Vargas was not acting under color of state law, the district court relied heavily on two interactions between Officer Medina–Vargas and Ortega–Barreto's wife that occurred prior to April 28. In Ortega–Barreto's wife's deposition, she testified that her husband and Officer Medina–Vargas were acquaintances and there had never been trouble between the two men. By contrast, she had experienced some difficulties with Officer Medina–Vargas.

---

**2.** Pursuant to Puerto Rico Police Department policy, police officers are on duty twenty-four hours a day and required to carry identification and a service revolver at all times. *See Parrilla–Burgos*, 108 F.3d at 446.

A few weeks before the shooting, Officer Medina–Vargas had seen her driving with a mechanic who did not have a license. Officer Medina–Vargas stopped her and warned her that if he saw her allowing a person to drive her car without a license, he would file a complaint against her. He also told her that "if I see you like that again our friendship will not be the same as before." Ortega–Barreto's wife thought this comment was strange because she "did not have any friendship with Medina, only that I would greet him whenever I saw him and because he would pass time with my husband."

She then described a later incident when Officer Medina–Vargas passed by while she and her children were sitting in their car. He "made an expression with his mouth like when you are going to blow someone a kiss but I don't know whether he did it to my boys or me, but he fixed his look on me. I had noticed Medina being somewhat strange and I had already told my husband." Although the court appropriately considered this deposition testimony in evaluating the motion for summary judgment, it was not entitled to draw inferences favorable to the defendant as to the "true" nature of the relationship between Officer Medina–Vargas and Ortega–Barreto's wife. The court stated:

> Medina's true purpose in creating the encounter became obvious when Ortega accused Medina of making a pass at his wife. Medina's prior actions toward Ortega's wife are indicative of the personal nature of his relationship with Ortega and his intentions when he intervened with him. Medina had been acting strangely around Ortega's wife, to the effect that he was requesting sexual and love favors from her. The love feud which was the cause of Medina's intervention then became evident.

*Barreto Rivera v. Medina,* 988 F.Supp. 28, 32 (D.P.R.1997). The court's analysis includes further references to the relationship between Officer Medina–Vargas and Ortega–Barreto's wife: "The case at issue . . . is the story of a man who felt unrequited love, hate, jealousy towards the husband of a woman he wanted," *id.;* "jealousy, which was mutual

between Medina and Ortega, had taken over for some time and was the underlying personal relation between them," *id.;* Officer Medina–Vargas's acts "were acts of a personal nature, in which the pent-up emotions of one man raged against those of another who wanted to have his wife and vice versa," *id.*

These statements about a "love feud" are improper inferences drawn against the nonmoving party on a motion for summary judgment. There was no evidence in the record that Officer Medina–Vargas was requesting sexual favors from Ortega–Barreto's wife. There was scant evidence to support the finding that Officer Medina–Vargas pursued Ortega–Barreto on April 28th because of a love feud.

In discussing the significance of Officer Medina–Vargas's call for back up on his police radio in the final moments of the confrontation, the court again drew an improper inference from the evidence in support of the defendants. Acknowledging that the call for back up "could constitute an act in official capacity", *id.,* the court went on to speculate that "Medina may have made the call in order to shoot Ortega and argue self-defense, knowing Ortega's volatility." *Id.* at 33. Such speculation adverse to the nonmoving party is inappropriate on a motion for summary judgment.

The court also placed undue emphasis on the subjective reactions of the victim to the confrontation with Officer Medina–Vargas. For example, the court states that "Ortega's reaction to Medina's pointing a gun in his direction was not that of a citizen confronting a police officer, but rather, as in *Parrilla–Burgos,* that of a participant in a private brawl." *Id.* The court further observed that the victim's actions were "not the acts of a person heeding another's status as a policeman; instead, they reflect Ortega's total disregard for Medina's official position." *Id.* Although we accorded the subjective reactions of the victim some relevance in the color of law analysis in *Martinez* and *Parrilla–Burgos,* the primary focus of the color of law analysis must be on the conduct of the police officer. *Cf. Pitchell v. Callan,* 13 F.3d 545, 548–49 (2d Cir.1994)(noting that plaintiff's argument "erroneously centers on [the

victim's] subjective reaction to [the officer's] conduct rather than the nature of [the officers'] activity, and misses the essence of the color of law requirement and the protection afforded by section 1983").

Officer Medina–Vargas was on duty, in uniform, patrolling in his police cruiser. *Cf. Pickrel v. City of Springfield,* 45 F.3d 1115, 1118 (7th Cir.1995)(remarking that police uniform, wearing of gun, and marked squad car parked outside of building were all indicia of state authority). Relying on his authority as a police officer, Officer Medina–Vargas attempted to stop Ortega–Barreto while he was driving his car home from the store. *Cf. Black v. Stephens,* 662 F.2d 181, 188 (3d Cir.1981)(finding that on-duty officer, dressed in police academy windbreaker, who pulled over vehicle to investigate whether driver was intoxicated was acting under color of law). Pursuant to his police powers, he demanded Ortega–Barreto's license and registration. When the two men began to fight, Officer Medina–Vargas forced Ortega–Barreto to submit with the use of his nightstick, a police-issued weapon and a potent symbol of police authority. *See Barna v. City of Perth Amboy,* 42 F.3d 809, 818 (3d Cir.1994)(noting that a police-issued nightstick is "an objective indicia of police authority"). When Ortega–Barreto came out of the house in the final moments of the confrontation and challenged Officer Medina–Vargas to put down his weapon, Officer Medina–Vargas used his police radio to request assistance from other police officers. *Cf. United States v. Tarpley,* 945 F.2d 806, 809 (5th Cir.1991)(noting that fact that off-duty police officer summoned another officer to home where officer was assaulting plaintiff was of particular significance in concluding that officer was acting under color of law). He then shot and killed the advancing, unarmed Ortega–Barreto with his service revolver. Reviewing the "nature and circumstances" of Officer Medina–Vargas's conduct and the "relationship of that conduct to the performance of his official duties," *see Martinez,* 54 F.3d at 986, we are unwilling to say that Officer Medina–Vargas's conduct was so clearly personal in nature that a jury could reach only one outcome. To the contrary, on this summary judgment record there remains a genuine

dispute about that issue. We must therefore vacate the court's entry of summary judgment.

## C. Supervisory Liability

A supervisor may be found liable under section 1983 on the basis of his own acts or omissions; liability may not be predicated upon a theory of respondeat superior. *See Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994)(citing *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 561 (1st Cir.1989)). A supervisor may be found liable if the "supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." *Gutierrez–Rodriguez,* 882 F.2d at 562. "[E]ven if a supervisor lacks actual knowledge of censurable conduct, he may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness, and if he had the power and authority to alleviate it." *Maldonado–Denis,* 23 F.3d at 582.

A plaintiff must also show that there is "an 'affirmative link' between the street-level misconduct and the action, or inaction, of supervisory officials." *Gutierrez–Rodriguez,* 882 F.2d at 562 (quoting *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)).

> This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient [causal] nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct. Consequently, deliberate indifference to violations of constitutional rights can forge the necessary linkage between the acts or omissions of supervisory personnel and the misconduct of their subordinates.

*Maldonado–Denis,* 23 F.3d at 582. A plaintiff can establish a causal link "if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Id.*

Officer Medina–Vargas's history in the police department was troubled at best. Despite failing the psychological component of the police academy entrance exam, he was admitted to the school. Over the course of his twenty-five year career, Officer Medina–Vargas was disciplined thirty times for abuse of power, unlawful use of physical force and/or physical assaults; six incidents led to recommendations that he be dismissed from the force. Toledo–Dávila's first review of Officer Medina–Vargas's file came in 1992, when an investigating officer recommended his dismissal because he had an extensive record of physical assaults and there had been no apparent change in his behavior despite sanctions. Ignoring the recommendation, Toledo–Dávila imposed a fifteen day suspension. Two weeks later, Toledo–Dávila reviewed another disciplinary action taken against Officer Medina–Vargas for the improper use of his firearm three years earlier. Following this review, Toledo–Dávila reduced Officer Medina–Vargas's sanction from a thirty day suspension imposed by the former superintendent to a two day suspension.

There is clearly sufficient evidence in this record to allow a jury to reasonably conclude that Toledo–Dávila displayed deliberate indifference to Officer Medina–Vargas's propensity toward violent conduct, and that there was a causal connection between this deliberate indifference and Officer Medina–Vargas's fatal confrontation with Ortega–Barreto.[3]

Judgment **VACATED.**

---

3. Plaintiffs argue that the court erred in dismissing their claim for punitive damages in count six of the amended complaint. In its order, the court dismissed the section 1983 claims of the decedent's mother and siblings because they did not have standing to bring the claims. The court also dismissed the claim for punitive damages on the ground that count six only stated a claim on behalf of the decedent's mother. Contrary to the plaintiffs' contentions, the court correctly read count six to apply only to decedent's mother. Plaintiffs do not contest the court's conclusion that decedent's mother could not assert a cause of action under section 1983. We find no error in the court's dismissal of count six.