United States Court of Appeals
 For the First Circuit

No. 98-1601

 ZASHA ZAMBRANA-MARRERO, ET AL.,

 Plaintiffs, Appellants,

 v.

 CARLOS SUAREZ-CRUZ, ET AL.,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Salvador E. Casellas, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 Coffin and Cyr, Senior Circuit Judges.

Judith Berkan and Federico Lora Lopez for appellants.
John F. Nevares with whom Gustavo A. Gelpi, John M. Garcia and
Isabel Abislaiman for appellees.

April 21, 1999

COFFIN, Senior Circuit Judge. This case requires us to
examine once again the often difficult concept of "under color of
state law" as it relates to the death of a private individual at
the hands of police officers. Plaintiffs, the widow and four
children of Rembert Zambrana-Rodriguez ("Zambrana"), filed this
lawsuit seeking damages under 42 U.S.C. 1983 and Puerto Rico law
after Zambrana died from injuries he suffered when two police
officers intervened in a fight at a bar. The district court granted
summary judgment for the defendants and dismissed the pendent state
law claims, on the ground that the officers' conduct constituted
private violence rather than violence "under color of state law" as
required for liability under section 1983. Our review of the
record and case law persuades us that the issue should have gone to
the jury. Accordingly, we vacate the judgment and remand for
further proceedings.
 I. Background
Consistent with our obligation in reviewing a grant of
summary judgment, we consider the facts in the light most favorable
to the plaintiffs, the non-moving parties, and also draw all
reasonable inferences in their favor. See Barreto-Rivera v.
Medina-Vargas, 168 F.3d 42, 44 (lst Cir. 1999).
On the night of June 10, 1993, Zambrana was socializing
at Freddy's Pub in Carolina, Puerto Rico, when he insulted the
girlfriend of the bar's owner, Freddie Casablanca. A verbal
exchange between Zambrana and Casablanca quickly escalated into a
physical fight. Other patrons in the crowded bar gathered around
to watch, and some of them attempted to separate the two men. 
Among those at the bar at the time were two police
officers, Carlos Suarez-Cruz ("Suarez") and Angel Rolon-Mercado
("Rolon"), who had been playing pool in an area somewhat removed
from the site of the fight. The officers had been together since
shortly after ending their shift earlier that evening and had
attended a birthday party for another officer before driving in
Suarez's personal car to the pub. The officers were partially in
uniform, both wearing their police-issue pants and boots. Rolon
also was wearing a t-shirt identified with the letters "DOT," the
Spanish acronym for the Tactical Operations Division of the police
department. Both also were carrying their police-issue weapons,
pursuant to departmental regulations.
Rolon encountered the fight when he walked over to the
bar to get more beer. He returned initially to Suarez to tell him
what was going on, and then went back to where the fight was taking
place, with Suarez following. At this point, Casablanca and
Zambrana were on the floor; Zambrana was pulling Casablanca's neck
chain, which was cutting the back of his neck and "choking" him,
and Casablanca was trying to free himself. When the two fighters
rose to their feet, Rolon and Suarez entered the fray: Suarez
grabbed Zambrana by putting his arm around Zambrana's neck, 
forcing him to let go of Casablanca. Other bystanders assisted
Casablanca, who went to the bathroom to clean up. Although
Casablanca was no longer involved, the fracas continued. As
Zambrana attempted to free himself from Suarez's hold, Rolon began
hitting Zambrana with all available objects, including a pool cue
and billiard ball, his boots and his service revolver.
By all accounts, Rolon's attack on Zambrana was
excessively vicious. Suarez sent Rolon to retrieve handcuffs from
the officers' car, and Suarez managed to place them on Zambrana by
sitting on top of him and pulling his arms behind his back. One
witness stated that Rolon told those gathered around the scene in
the bar not to intervene because he and Suarez were police
officers. After Zambrana was handcuffed, Casablanca told Suarez
to take the fight outside. 
Once outside, Rolon searched Zambrana and seized a small
packet of cocaine from him. The officers also took out his wallet
and kept his ATM card. Suarez and Rolon left the scene a short
time later, leaving Zambrana lying on the ground, seriously
injured. Zambrana was taken home and, early the following morning,
admitted to the hospital. He died two days later of kidney failure
due to bodily trauma.
Plaintiffs filed a complaint under 42 U.S.C. 1983
against Suarez and various of his supervisors, alleging that
Zambrana's civil and constitutional rights had been violated by the 
officers' conduct. Additional claims were asserted under Puerto
Rico law. The defendants filed various motions to dismiss and for
summary judgment, and on March 31, 1998, the district court granted
summary judgment for all defendants based on its conclusion that
plaintiffs had offered insufficient evidence to prove that Suarez
and Rolon acted "under color of law" as required to establish a
violation of section 1983. The court dismissed the pendent state
law claims. This appeal followed.
 II. Discussion
A. Summary Judgment Standard
A district court may grant summary judgment only "if the
pleadings, depositions, answers to interrogatories, and admissions
on file, together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). Our review is de novo, and, as noted earlier, see supra at
2, we evaluate the record in the light most favorable to the non-
moving party, in this case the plaintiffs. Summary judgment is
appropriate only if the evidence taken in that light "fails to
yield a trialworthy issue as to some material fact." Martinez v.
Colon, 54 F.3d 980, 983-84 (lst Cir. 1995). Otherwise stated, our
task is to determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law." 
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).
In this specific case, that obligation is to decide
whether a jury could find that Suarez and Rolon acted "under color
of state law" when they intervened in Zambrana's fight with
Casablanca and administered the blows that led to Zambrana's death.
 B. Under Color of State Law
Establishing that the defendant acted "under color of
state law" is one of two essential requirements for an action under
section 1983, which imposes liability only for conduct 
attributable to the state. In distinguishing private action from
state action, the general inquiry is whether "a state actor's
conduct occurs in the course of performing an actual or apparent
duty of his office, or . . . is such that the actor could not have
behaved in that way but for the authority of his office." 
Martinez, 54 F.3d at 986. The concept can be particularly elusive
when applied to police conduct, as we have recognized in three
recent cases. See Barreto-Rivera, 168 F.3d at 45-46; Parilla-
Burgos v. Hernandez-Rivera, 108 F.3d 445, 448-50 (lst Cir. 1997);
Martinez, 54 F.3d at 986-87. We quote from Barreto-Rivera:
No single, easily determinable factor will
control whether a police officer was acting
under state law. While certain factors will
certainly be relevant for example, a police
officer's garb, an officer's duty status, the
officer's use of a service revolver, and the
location of the incident these factors must
not be assessed mechanically.

168 F.3d at 45 (citation omitted).

Resolving the "under color of law" question therefore
requires an assessment of the totality of the circumstances, in
which we must consider both "'the nature and circumstances of the
officer's conduct and the relationship of that conduct to the
performance of his official duties.'" Barreto-Rivera, 168 F.3d at
46 (quoting Martinez, 54 F.3d at 986-87); see also Parilla-Burgos,
108 F.3d at 449. The determination does not turn on "whether an
officer stays strictly within the line of duty, or oversteps it." 
Martinez, 54 F.3d at 986. An officer who abuses or exceeds his
recognized authority may be acting under color of law if, "at the
time in question, [he] purposes to act in an official capacity or
to exercise official responsibilities pursuant to state law." Id. 
Although the subjective reactions of the victim may have some
relevance, "the primary focus of the color of law analysis must be
on the conduct of the police officer," Barreto-Rivera, 168 F.3d at
47, and whether it "related in some meaningful way either to the
officer's governmental status or to the performance of his duties,"
Martinez, 54 F.3d at 987.
In both Martinez and Parilla-Burgos, the application of
these principles led us to uphold district court summary judgment
rulings that the plaintiffs had failed to establish that the
defendant police officers acted "under color of state law." In
Martinez, an on-shift police officer accidentally shot and maimed
a fellow off-shift officer after repeatedly harassing that officer
in the station house. Although he was in uniform and armed with
his service revolver, the harassing officer never asserted his
authority as a police officer. We concluded that he "was bent on
a singularly personal frolic: tormenting an acquaintance. Though
on duty and in uniform, [the officer's] status as a police officer
simply did not enter into his benighted harassment of his fellow
officer," Martinez, 54 F.3d at 987 (footnote omitted).
The facts in Parilla-Burgos more closely resemble those
before us. In that case, an off-shift police officer using his
service revolver fatally shot a fellow bar patron. The officer,
who was on medical leave and not in his uniform, had encountered
the decedent at the bar, telling him: "I'll look at you whichever
way I please, because I am a cop." See 108 F.3d at 447. The
exchange escalated and the officer repeated his claim to special
status: "I look at anybody I want, because I'm a cop. Anybody I
decide I want to look at dirty, I look at them dirty." See id. 
The officer apparently displayed his identification to the crowd
gathered around, telling the onlookers that he was there to keep
the peace. That statement stopped the fracas briefly, but it soon
resumed, and the decedent challenged the officer to step outside
without his gun. The officer responded, "I don't need a gun to
fight you," but he nevertheless took the gun with him when the two
men left the bar. Moments into the fight, the officer pulled out
his weapon and fired the six shots that killed the decedent.
We concluded that, despite the officer's comment that he
was in the bar to keep peace and his showing of police
identification, the officer's conduct demonstrated that he was
acting in a private capacity. See id. at 450. We observed that
statements such as those by the officer claiming a special
privilege to "look dirty" at an individual by virtue of his
position as a police officer "do not constitute action under color
or pretense of state law if the asserted privilege lies clearly
outside the scope of their official duties." Id. at 451. Weighing
heavily in our decision was that the final exchange between the
officer and the decedent before they left the bar amounted to an
invitation and acceptance to engage in a private brawl, after which
the officer made no further pretense of official action. SeeBarreto-Rivera, 168 F.3d at 46; Parilla-Burgos, 108 F.3d at 450-51.
We found the pre-trial evidence less decisive in Barreto-
Rivera. The episode there began when the defendant officer,
driving in his cruiser, followed the decedent as he drove home from
a local store. When they reached the house, the officer demanded
the decedent's license and registration. A verbal exchange
occurred outside the home, during which the decedent accused the
officer of making a pass at his wife. The two men exchanged
punches and the officer repeatedly hit the decedent with his night
stick before the pair was separated and the decedent went into the
house. At that point, two of the decedent's family members
approached the officer and were pushed and shoved by him. Seeing
the conflict, the decedent came out of the house, picked up a piece
of plastic tube from his yard, and approached the officer. 
Although several witnesses took the tubing from the decedent, the
officer radioed for back-up help, stating: "10-50, I have been
attacked. Hurry up, this guy is acting tough and I am going to
have to shoot him." 168 F.3d at 44. The decedent told the officer
to drop his gun and fight with his fists. The officer responded by
telling the decedent not to come any closer or he would shoot. The
decedent continued to approach, and the officer fatally shot him.
The district court in Barreto-Rivera relied on deposition
testimony to conclude that the officer's encounter with the
decedent stemmed from a "love feud" and that his behavior and the
shooting consequently were acts of a personal nature. See id. at 
47. The district court equated the showdown to the "private brawl"
in Parilla-Burgos, observing that the officer's call for back up on
his police radio in the final moments of the confrontation a
seemingly official act might have been designed to set up a claim
of self-defense for his plan to shoot the decedent. The court
found it significant that the decedent's "actions were `not the
acts of a person heeding another's status as a policeman; instead,
they reflect [the decedent's] total disregard for [the officer's]
official position.'" Id.
On review, however, we held that the facts and possible
inferences did not lead inexorably to a finding of private conduct. 
We discounted the decedent's subjective reactions to the
confrontation and noted numerous indicators of official action: the
officer was on duty, in uniform, patrolling in his cruiser, and he
relied on his authority as a police officer to stop the decedent
and demand his license and registration. We further observed that
the officer used his nightstick "a police-issued weapon and a
potent symbol of police authority" against the decedent, that the
officer summoned help on his police radio, and ultimately shot and
killed the decedent with his service revolver. Id. at 48. In such
circumstances, we were "unwilling to say that [the officer's]
conduct was so clearly personal in nature that a jury could reach
only one outcome." Id. We therefore vacated the judgment for
defendants.
C. Applying the Standard
In its assessment of the circumstances before us, the
district court highlighted testimony that Rolon had "excitedly"
joined in the fight, which indicated to the court a desire to
participate rather than to establish order. The court also pointed
to Rolon's "brutal and random attack of Zambrana . . . and his
decision to steal his wallet." At the same time, the court
downplayed the officers' use of official measures, particularly the
handcuffs and search of Zambrana, observing that these techniques
were not used for the usual purposes of facilitating an arrest or
checking for weapons or contraband. In the court's view, the
totality of the circumstances showed that "[m]ore likely than not,
their conduct consisted of private violence engaged in by two
individuals who happened to work for the state . . . ."
Though we acknowledge that this is one plausible reading
of the evidence, we are unpersuaded that it is the only one. We
believe that the record contains sufficient indicia of official
police action that a jury reviewing the "nature and circumstances"
of Suarez and Rolon's conduct and the "relationship of that conduct
to the performance of [their] official duties," see Martinez, 54
F.3d at 986, could conclude that they acted under color of state
law, albeit in clear abuse of their authority.
We begin our discussion of the evidence by noting a
significant difference between the circumstances here and those in
all three of the earlier cases discussed above. In Martinez,
Parilla-Burgos and Barreto-Rivera, the injury and deaths arose out
of incidents in which the police officers were original
participants. Here, by contrast, Rolon and Suarez entered an
already developed dispute between two private individuals, and
their action in helping to pull Zambrana and Casablanca apart was
consistent with the responsibility of police officers to defuse
violent situations. That Rolon's intervention quickly turned
brutal and inappropriate does not negate the possibility that this
was an official action. Nor does the testimony noted by the
district court describing Rolon as "excitedly" entering the fight. 
The actual testimony did not, in fact, describe Rolon as "excited." 
Suarez was asked in his deposition whether Rolon became involved
"because of the excitement," and he answered "yes." Read in a
light most favorable to plaintiffs, Suarez's testimony may simply
have indicated that the commotion caused by the fight prompted
Rolon to step in.
The evidence contained a number of additional indicators
of official action: Rolon's telling onlookers to stay away because
he and Suarez were police officers; the use of handcuffs to subdue
Zambrana; the search of Zambrana and seizure of cocaine; and a
statement by Suarez to a friend of Zambrana's that he planned to
pursue drug and possibly other charges against Zambrana. 
Moreover, unlike in Parilla-Burgos, where the officer's assertion
of special status occurred only in the opening minutes of the
episode, the indicia of official conduct here spanned the entire
interaction, ending with the search and seizure. 
Taken together, these circumstances permit a judgment
that Suarez and Rolon took control of the Zambrana/Casablanca fight
in furtherance of their duty as police officers and for the purpose
of ending the disturbance; that they did so in part through Rolon's
abuse of his police power and in part through the use of a
traditional law enforcement tool, the handcuffs; and that the
search of Zambrana was conducted under the apparent authority of
the officers' official status. Even if Suarez and Rolon's purpose
in searching Zambrana was to steal whatever they could from him, we
believe a jury could conclude that their actions were taken under
color of law because they were enabled by their status as police
officers. As noted earlier, an individual's conduct is
attributable to the state not only if it arises from the
performance of actual duties but also if it occurs in the course of
performing an apparent duty of his office, or "is such that the
actor could not have behaved in that way but for the authority of
his office." Martinez, 54 F.3d at 986. Cf. Stengel v. Belcher,
522 F.2d 438, 440-41 (6th Cir. 1975).
In sum, we think there was enough here to warrant putting
the question to the jury. Indeed, the district court, evidently
recognizing that the evidence tipped in both directions, phrased
its conclusions in language undermining its conclusion that summary
judgment was appropriate; rather than stating that the evidence
could lead to but one result, the court observed that "[m]ost
probably, Rolon and Suarez's motive was purely criminal in
nature," and "[m]ore likely than not," their conduct consisted of
private violence. A conclusion that the dispositive fact is more
likely than not is inconsistent with the standard for summary
judgment.
As in Barreto-Rivera, the court appears to have
improperly engaged in its own weighing of the evidence, failing to
give the plaintiffs the benefit of all inferences to be drawn from
the available facts. See 168 F.3d at 47. We therefore vacate its
entry of summary judgment and remand for further proceedings on
plaintiffs' section 1983 claim.
D. Pendent Claims
The district court declined to exercise jurisdiction over
plaintiffs' pendent Commonwealth law claims because of its
dismissal of the section 1983 claim. In light of our disposition
on the federal civil rights claim, we vacate dismissal of the
pendent claims and remand those as well for further attention by
the district court.
Vacated and remanded.