# United States Court of Appeals
## For the First Circuit

Nos. 11-2339, 13-1169

EVELYN RAMÍREZ-LLUVERAS; JENITZA CÁCERES, represented by
Evelyn Ramírez-Lluveras; M.C., represented by Evelyn
Ramírez-Lluveras; M.A.C., represented by
Evelyn Ramírez-Lluveras,

Plaintiffs, Appellees/Cross-Appellants,

v.

EDWIN RIVERA-MERCED; PEDRO TOLEDO-DÁVILA;
LIEUTENANT VÍCTOR CRUZ-SÁNCHEZ; SERGEANT RAFAEL FIGUEROA-SOLÍS;
SERGEANT JUAN COLÓN-BÁEZ,

Defendants, Appellants/Cross-Appellees,

JAVIER PAGÁN-CRUZ; CARLOS SUSTACHE-SUSTACHE; ZULMA DÍAZ;
MIGUEL VÁZQUEZ-SAN ANTONIO; JOHN DOES A-Z, Rep. Employees,
Contractors, or Agents of the P.R. Police Department,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Susana I. Peñagarícano-Brown, Assistant Solicitor General,
with whom Margarita L. Mercado-Echegaray, Solicitor General, was on
brief, for appellants/cross-appellees.
Judith Berkan, with whom Mary Jo Méndez and Berkan/Méndez were
on brief, for appellees/cross-appellants.

July 14, 2014

**LYNCH, <u>Chief Judge</u>**.  This tragic case arises out of the unwarranted shooting death of a civilian, Miguel A. Cáceres-Cruz, in Puerto Rico by an on-duty police officer, Javier Pagán-Cruz. Plaintiffs, the victim's surviving wife and children, sued Pagán, his two fellow officers on the scene, and five supervisors under 42 U.S.C. § 1983 for violating the decedent's Fourth Amendment rights by causing his wrongful death.

The supervisors initially moved to dismiss the claims against them under Fed. R. Civ. P. 12(c); that motion was granted in part and denied in part.  <u>See</u> <u>Ramirez-Lluveras</u> v. <u>Pagan-Cruz</u>, 833 F. Supp. 2d 151, 165 (D.P.R. 2011).  Later, after discovery, the five supervisors successfully moved for summary judgment on the remaining claims against them.  <u>See</u> <u>Ramirez-Lluveras</u> v. <u>Pagan-Cruz</u>, 833 F. Supp. 2d 165, 182 (D.P.R. 2011).  Afterward, the plaintiffs prevailed at trial against the defendants Pagán and the two other on-scene officers, Carlos Sustache-Sustache and Zulma Díaz.  The jury awarded the plaintiffs approximately $11.5 million.

The case now reaches us on two appeals: the plaintiffs' appeal from the district court's grant of summary judgment in favor of the supervisory defendants (No. 13-1169) and the supervisory defendants' appeal from the district court's earlier denial of their Rule 12(c) motion (No. 11-2339).  We affirm the grant of summary judgment against plaintiffs' supervisory liability claims against each of the supervisors.  We dismiss the Commonwealth's

appeal from the earlier partial denial of the Rule 12(c) motion as to these same defendants.

I.

We briefly describe the procedural history before turning to the facts of the case. On April 28, 2008, the plaintiffs filed suit under § 1983 against Pagán and his two on-scene colleagues, Officers Carlos Sustache-Sustache and Zulma Díaz (collectively, the line officers), and against Col. Edwin Rivera-Merced, the Puerto Rico Police Department (PRPD) Area Commander for Humacao, as their supervisor. On March 30, 2009, the plaintiffs amended their complaint to add the four other supervisory officers as defendants. However, none of the claims against any of the supervisory defendants arose from any direct supervision of Pagán on the night of the shooting or from any personal involvement of the supervisors with the shooting. The supervisory defendants answered the amended complaint and set forth a list of forty-one affirmative defenses, including qualified immunity.

On April 20, 2010, the supervisory defendants filed a "Motion to Dismiss Amended Complaint and/or for Judgment on the Pleadings" under Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure.[1]

_____

[1] For reasons not revealed in the record, neither the court nor plaintiffs reacted to the motion until the supervisory defendants asked the court to grant the motion as unopposed on December 8, 2010. On December 20, 2010, plaintiffs filed an opposition to the motion.

The district court granted the motion in part and denied it in part on September 30, 2011. Specifically, the court dismissed all of the plaintiffs' § 1983 claims, including the Fourth Amendment claims, against the supervisory defendants brought in the plaintiffs' own individual capacities, as opposed to their capacities as representatives of the victim. It did so based on its finding that the plaintiffs lacked standing to assert individual claims because there was no allegation that the supervisors' conduct was aimed at the family relationship. The court dismissed all claims under the Fourteenth Amendment. It also granted the motion as to other claims against the supervisory defendants in the plaintiffs' representative capacities. It allowed the § 1983 Fourth Amendment claims against the supervisory defendants to proceed, declining to resolve their qualified immunity defense on the pleadings.[2] The plaintiffs did not appeal the dismissal of these claims in the plaintiffs' individual capacities against the supervisors. The supervisory defendants appealed from the denial of their motion to dismiss as to the Fourth Amendment § 1983 claims against them.[3]

_____

[2] The district court also denied the motion to dismiss as to plaintiffs' supplemental negligence claims under Article 1802 of the Puerto Rico Civil Code. Neither party presents an argument about the Article 1802 claim, so those arguments are waived. See Ortiz v. Gaston Cnty. Dyeing Mach. Co., 277 F.3d 594, 598 (1st Cir. 2002).

[3] Because the supervisory defendants had already prevailed on summary judgment by the time their appeal from the Rule 12(c)

On December 22, 2011, the district court granted the supervisory defendants' motion for summary judgment. This left the claims against the line officers, Pagán, Sustache, and Díaz.

The claims against the line officers went to trial before a jury in late October 2012. On November 9, 2012, the jury reached a verdict in favor of the plaintiffs against all three line officers. After entry of final judgment, the plaintiffs appealed the grant of summary judgment in favor of the supervisory defendants.[4] The two appeals were consolidated.

## II.

The following facts are undisputed, except where noted. To the extent the facts are disputed, we take them in the light most favorable to the plaintiffs for purposes of the supervisory defendants' motion for summary judgment. See Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008).

A.        The August 11, 2007 Shooting

Miguel A. Cáceres-Cruz ("Cáceres"), the victim, was a member of the Punta Santiago Scooter Club. On the evening of August 11, 2007, around 6:10 p.m., roughly eleven members of the

---

decision was processed, we granted plaintiffs' motion to stay that appeal pending the entry of final judgment in the district court.

[4] The summary judgment decision was not immediately appealable because the case against the line officers remained active. Plaintiffs first asked the district court to certify the summary judgment decision to this court for appeal; that request was denied. Plaintiffs then asked the court to reconsider its summary judgment decision; that motion was also denied.

Club brought their scooters to a house for a quinceañero[5] at which they were to serve as an escort for the fifteen-year-old birthday girl.  With the scooters parked on the street, two-way traffic was obstructed, so Cáceres helped direct cars around the parked scooters.

One of the cars caught in the traffic was a PRPD Ford Explorer in which officers Pagán, Sustache, and Díaz were riding. The officers were not assigned to a patrol in this area, Punta Santiago, but instead were passing through on their way to a different area, Naguabo, to which they were assigned to combat drug trafficking.  They did not have any directions to engage in any actions in Punta Santiago.  In fact, the officers passed through Punta Santiago only because they chose to take a different route to Naguabo than they had been instructed to take after picking up Officer Díaz, who had been late for her shift.

When Pagán reached Cáceres's position, he told Cáceres that only the police have the authority to direct traffic.  He also ordered the club members to move their scooters off the road within five minutes.  What happened next is not entirely clear, although both parties agree with the general outlines.  There is a dispute over whether the club members actually began moving their scooters. The parties agree that Pagán and Cáceres began exchanging insults

---

[5] A quinceañero is a traditional coming-of-age birthday party thrown for girls as they turn fifteen, with rough similarities to a "sweet sixteen" party.

and that at some point in the exchange, Díaz told Cáceres that he was under arrest.  A video of the incident shows the three officers separating Cáceres from his fellow club members.  A fight broke out.  The parties dispute who initiated the physical contact, but they agree that, at some point, Cáceres resisted, hitting both Díaz and Pagán.  Eventually, either the officers drove Cáceres to the ground or he stumbled to the ground after being hit.  Pagán punched Cáceres in the face while Cáceres was on the ground.  Cáceres had been driven to a seated position on the ground with his back against a fence.  As he sat, he was straddled by Pagán and surrounded by the other two officers.

From the ground, Cáceres reached up and touched Pagán's gun holster; the parties dispute whether he was simply reaching for Pagán's leg while he was trying to stand or whether he was continuing the fight.  Pagán placed his hand on top of Cáceres's and the two struggled over the gun.  Eventually, the gun, still holstered on Pagán, went off and shot Pagán in his leg.  Pagán pulled away from Cáceres, who slumped from a sitting position to lying with his stomach on the ground.  While Cáceres was still on the ground, Pagán drew his gun and shot Cáceres multiple times in the back.  After a pause, Pagán shot Cáceres one final time, this time in the head, administering a coup de grâce.  Cáceres died from the shooting.  He was 43 years old at the time.  Pagán was 33 years old, and a 13-year veteran of the PRPD.

The officers retreated to their car and left the scene. Díaz then used the police radio to inform a dispatcher that Pagán was bleeding profusely. She did not mention the shooting of Cáceres.

There are later events which the plaintiffs discuss at length as evidence of an alleged cover-up of the shooting. Specifically, the plaintiffs explain that some of the supervisory defendants represented to the media that Pagán had clearly been acting to defend himself against Cáceres's unprovoked aggression. However, the plaintiffs do not explain how any alleged cover-up after the shooting would be relevant to their claims, which are based on a wrongful death theory, since any alleged cover-up would have occurred after Cáceres had already died. We do not discuss the cover-up theory. Pagan was dismissed from the PRPD on June 4, 2008.

B.      Pagán's Disciplinary History

The plaintiffs' theories of liability against the supervisory defendants rely heavily on the proposition that Pagán's disciplinary history provided adequate warning to his supervisors that he was at substantial risk of committing an unjustified shooting of an arrestee as an armed officer, and that the supervisors were deliberately indifferent to this risk. The plaintiffs then assert theories that various policies and

procedures interfered with the defendants' taking appropriate actions on those risks.

Pagán had been the subject of seven disciplinary complaints before the August 11, 2007 shooting. The first complaint, in 1998, was for theft of government property (which he had left in the trunk of his personal vehicle), for which he received a warning.

The second complaint, and of most significance to this case, was a set of 1999 domestic violence allegations described in the official record as follows: "The complainant alleged that after [complainant] entered into a romantic relationship with [Pagán] he attacked her because he saw her talking with another officer and he threatened her with his regulation firearm." The PRPD's initial investigation of these allegations started immediately and ran through 2004. In 2004, the PRPD Superintendent released an initial disciplinary recommendation for termination of Pagán's employment. After a hearing in which Pagán denied the allegations, the Superintendent in May 2006 instead ordered discipline of 60 days' suspension from employment without pay. Pagán served that discipline between August and October of 2006.

The third complaint was a 1999 insubordination charge, which was pending at the time Pagán was dismissed from the PRPD after the August 11, 2007 shooting and was filed for future reference as a result. A fourth complaint was filed in 2002 for

Pagán's failure to appear in a local court after being subpoenaed. Later in 2002, there was a fifth complaint about reporting a "loss" in a stolen and recovered vehicle report. Sixth, in 2003, Pagán was charged with failing to take action on a complaint filed by a citizen; the charge was filed in the record. Finally, in 2004, there was a complaint for assaulting a motorcyclist, about which there are no other details in the record. The charge was also filed in the record.

We return to the domestic violence complaint, which was considered "substantiated" after the initial investigation, and on which the plaintiffs' case largely rests. The domestic violence complaint was based on three incidents beginning in August 1998 involving Pagán's then-girlfriend: (1) in August 1998, after Pagán saw his girlfriend speaking with another police officer, the girlfriend alleged that Pagán slapped her, pointed his official firearm at her, and threatened to kill her if he saw her with another man; (2) later, the girlfriend also alleged that after she and Pagán had broken up and she sent Pagán a bill for a beeper she had bought him as a gift, he "burst" into her home and told her, "Who the hell asked you to send the beeper and the bill with Officer Sammy Torres," which upset her; and (3) later, the girlfriend added the claim that at some earlier time in 1998, Pagán had stored in her home an arrestee's firearm for three days before removing it and taking it to the Firearms Division, and that he

"swore that he was going to kill the arrestee."  (Pagán did not kill the arrestee, nor did he take any steps toward doing so.)

The PRPD promptly investigated the girlfriend's complaint.  On the same day the complaint was filed, the supervisor on duty interviewed the complainant, went to the District Attorney, who decided there was no basis to file criminal charges against Pagán, and notified the PRPD Juncos District Commander of the administrative complaint.  Two days later, a memo was sent from the Juncos District Commander to the Humacao Area Commander submitting the domestic violence complaint for consideration.  It described the complaint as follows:

> The claimant alleges that she had an intimate consensual relationship with [Pagán] for several months.  That, during the month of August and on September 29, 1998, she was psychologically and verbally abused through threats made by the same, which would make her worry.

The memo repeated that the District Attorney had declined to file charges since he believed no domestic violence in violation of Puerto Rico law had been committed.  The memo also stated that Pagán's police-issued firearm had been seized and he had been referred to the Domestic Violence Division in compliance with PRPD guidelines.

As to the Domestic Violence Division, on December 17, 1998, the Director of the Domestic Violence Division asked that Dr. Aida Myrna Vélez of the Psychology and Social Work Division give

priority to a psychological evaluation of Pagán, referencing an earlier request which had been made on October 19, 1998. There is no evidence that the psychological evaluation produced any indication that Pagán was thought to pose a risk to others.

As of August 2000, the PRPD conducted a formal administrative investigation into the domestic abuse charges. Sgt. José Berríos Díaz documented his investigation in an August 23, 2000 memo to the Assistant Superintendent responsible for administrative investigations. The memo characterized the complainant as being the "victim of verbal and psychological abuse through threats made by [Pagán]." Evelyn Velázquez, a friend of the complainant, was interviewed and stated Pagán had "verbally insulted" the complainant and had threatened the complainant with death, but that the complainant had never told her that Pagán ever "physically assaulted her." Velázquez also confirmed that Charlie, the arrestee whose gun had been kept temporarily at the complainant's house, had made threats against Pagán. Velázquez also said that while with Pagán and the complainant, Velázquez had once "playfully" taken Pagán's gun and pointed it him, "also playfully," so that he "would learn" what his girlfriend felt when he had threatened her.

The report stated that "Pagán was interviewed and stated that what was being said was not true." The investigative report

concluded that Pagán had committed four serious violations of PRPD standards of conduct.[6]

Based upon this report, then-Superintendent Agustín Cartagena Díaz wrote to Pagán on August 30, 2004, informing him of the results of the investigation. Based on the girlfriend's allegations, the letter expressed an intent to expel Pagán from the PRPD. The letter notified Pagán of his right to a hearing on the issue.

Pagán requested a hearing, which was held on October 8, 2005. After the hearing, an Associate Police Superintendent, signing on behalf of Police Superintendent Pedro Toledo-Dávila, informed Pagán by a letter dated May 18, 2006 that the proposed expulsion would be converted to a 60-day suspension without pay. Importantly, the May 18, 2006 letter stated: "After evaluating the record we have determined that the sanction announced in the

---

[6] The violations were:

Serious Offense #1: "Show a patent inability, incompetence, carelessness, partiality or negligence in the performance of his or her duties, functions and responsibilities."
Serious Offense #3: "Leave police-issued firearms or any other firearm carried or possessed under a permit at the reach of other persons who are not authorized to use them or allow others to use them, or failing to take the corresponding measures in relation to them."
Serious Offense #2: "Threaten with, or use, a firearm against any person, except when defending oneself or others.["]
Serious Offense #27: "Acting in a damaging, immoral or disorderly manner to the detriment of the Police Department."

Resolution of Charges must be modified. In consequence I suspend you from employment and pay for the term of sixty (60) days effective on the date of notification for this communication" (emphasis added).

Pagán apparently did not appeal that decision. Pagán served the suspension without pay between August and October 2006. This was eight years after the underlying domestic abuse events had occurred. It was one year before the shooting. There were no other domestic violence charges aside from those arising out of the events in 1998.

On November 4, 2004, Pagán was reassigned by the Humacao Area Commander to the Special Response Team of the Tactical Operations Division (TOD), an "elite unit" trained "to deal with sensitive situations."

C.        The Identity and Role of the Supervisory Defendants

The plaintiffs originally sued Col. Edwin Rivera-Merced, Humacao Area Commander, as the supervisor of the three line officers. The plaintiffs later added another four supervisors at various levels in the Puerto Rico police department: Superintendent Pedro Toledo-Dávila, Lt. Víctor Cruz-Sánchez, Sgt. Rafael Figueroa-Solis, and Sgt. Juan Colón-Báez.

On the date of the shooting in August 2007, the chain of command above Pagán was as follows. Sgt. Colón-Báez was serving as Acting Director of the TOD while Sgt. Figueroa-Solis, its regular

Acting Director at the time, was on vacation.  In that temporary position, Sgt. Colón-Báez had Pagán and another thirty or so officers in the TOD under his supervision.  Sgt. Colón-Báez was in turn supervised by Lt. Cruz-Sánchez, the officer in charge of the Humacao area.  He reported to Col. Rivera-Merced, the Humacao Area Commander who oversaw 400 to 500 officers, and Col. Rivera-Merced reported to Superintendent Toledo-Dávila, who was the highest ranking officer in the entire PRPD.

    1.    <u>Superintendent Toledo-Dávila</u>

Toledo-Dávila, now deceased, was the Police Superintendent of the PRPD at the time of the shooting, serving from 1993 to 2000 and again from 2005 to 2008.  This is the highest position in the PRPD, which had thousands of officers in its service.

The plaintiffs alleged that Superintendent Toledo-Dávila instituted policies making it difficult for lower-level supervisors to become aware of officers' offenses by removing the facts about the offenses from their disciplinary memoranda.  As to personal supervisory involvement with Pagán, Toledo-Dávila was the superintendent who set Pagán's sanction for the domestic violence complaint at a 60-day suspension in 2006 after the hearing, a lighter punishment than the initial pre-hearing recommendation of expulsion.  Superintendent Toledo-Dávila is not alleged to have had

-16-

any direct involvement with, or even direct supervisory responsibility over, Pagán's actions on August 11, 2007.

      2.    <u>Col. Rivera-Merced</u>

Col. Rivera-Merced was the Area Commander of the Humacao area, which is where Pagán served on the day of the shooting. In that role, Col. Rivera-Merced oversaw about 400 to 500 police officers. The plaintiffs claim that Col. Rivera-Merced knew about Pagán's 2006 suspension because he had personally "processed" it, and that he was responsible for assigning Pagán to the TOD. Col. Rivera-Merced also had the authority to refer officers under him to counseling and to receive fitness-for-duty recommendations. The plaintiffs' primary allegation against Col. Rivera-Merced is that upon Pagán's return from the 2006 suspension, he immediately placed Pagán back into the "elite" TOD without meaningfully considering Pagán's fitness for that unit.[7] The plaintiffs also argue that Col. Rivera-Merced failed to assign an adequate number of supervisors to the TOD. There is no claim that Col. Rivera-Merced had directly supervised Pagán on the day of the shooting; indeed, there were several layers of supervisory personnel between Col. Rivera-Merced and Pagán, and Rivera-Merced was not on duty on August 11, 2007.

---

[7] The dissent faults Lt. Cruz-Sánchez for the fact that he "took Pagán right back in to the TOD," even though that decision was made by Col. Rivera-Merced. Lt. Cruz-Sánchez's decision not to countermand his superior cannot be a basis for finding him liable.

### 3. Lt. Cruz-Sánchez

Lt. Cruz-Sánchez was the Director of the TOD in Humacao through March 2007, when he was elevated to Commander of the Humacao precinct. In his role as TOD Director, Lt. Cruz-Sánchez oversaw about 30 officers. Lt. Cruz-Sánchez evaluated Pagán a few months after his return from the suspension and "gave him glowing ratings." These high ratings may have been given in part because he gave all of his subordinates high ratings and pro forma evaluations.

The plaintiffs allege Lt. Cruz-Sánchez was directly responsible for selecting line officer Díaz for the TOD and did so without reviewing her personnel file. But there is no claim that had he reviewed the file, Lt. Cruz-Sánchez would have had reason to believe Officer Díaz would pose a substantial risk to civilians; moreover, Díaz was not the shooter. Lt. Cruz-Sánchez also had direct knowledge of Pagán's suspension but did not know its cause; he later testified that he thought Pagán had been suspended for mishandling an investigation. There is no claim that Lt. Cruz-Sánchez was directly supervising Pagán at the time of the shooting.

### 4. Sgt. Figueroa-Solis

Sgt. Figueroa-Solis was a supervisor in the TOD and was promoted to Acting Director in March 2007 after Lt. Cruz-Sánchez's promotion to precinct commander. There were no other ranked

supervisors in the TOD while Sgt. Figueroa-Solis was Acting Director. Sgt. Figueroa-Solis went on vacation in July and August 2007 and was out of town on the date of the shooting; during that time, Sgt. Colón-Báez served as Acting Director. The plaintiffs allege that Sgt. Figueroa-Solis did not review the disciplinary files of his subordinates -- arguably against department requirements, although his status as "Acting" Director makes the precise requirement unclear. He also did not review Pagán's record when Pagán entered the TOD; the plaintiffs allege it is reasonably clear that he would have been expected to do so to make sure that the new officer was fit for the assignment. Sgt. Figueroa-Solis was the individual who notified Pagán about his proposed expulsion in 2004, but he was not familiar with the complaint underlying the proposal. He was also responsible along with Sgt. Colón-Báez for choosing Sustache and Pagán for the Impact Unit within the TOD. Because he was on vacation on August 11, 2007, Sgt. Figueroa-Solis was not directly supervising Pagán at the time of the shooting.

### 5. Sgt. Colón-Báez

Finally, Sgt. Colón-Báez was Lt. Cruz-Sánchez's assistant while the latter was director of the TOD. He remained Lt. Cruz-Sánchez's assistant upon Lt. Cruz-Sánchez's promotion to precinct commander in early 2007, but returned to the TOD as Acting Director while Sgt. Figueroa-Solis was on vacation in July and August of 2007. He shared responsibility with Sgt. Figueroa-Solis

-19-

for placing Sustache and Pagán on the Impact Unit.  Sgt. Colón-Báez was the person who actually served Pagán with his suspension notice in 2006.  He was aware that the suspension was related to domestic violence but made no further inquiries.[8]  Sgt. Colón-Báez was Pagán's direct superior on the night following the shooting, but he had no direct involvement with the actual events leading up to the shooting, nor did he give any assignments to Pagán leading to the shooting.  In fact, Sgt. Colón-Báez was on his day off on August 11, 2007.

### III.

We begin with the plaintiffs' appeal of the grant of summary judgment in favor of the supervisory defendants.  We review the district court's grant of summary judgment de novo, reading the facts and drawing all inferences in the light most favorable to the plaintiffs.  See Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008). Summary judgment is proper if there is no genuine dispute of material fact and the defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

A.        Supervisory Liability Under § 1983

The defendants strongly urge that this case be used as a vehicle to recast the contours of supervisory liability in the

---

[8] The dissent assumes that Sgt. Colón-Báez "kn[ew] full well of Pagán's violent past," but we see nothing in the record to support that speculation.  The dissent goes on to say that Sgt. Colón-Báez did not review Pagán's disciplinary file, "which would have uncovered" that "violent past."

-20-

aftermath of <u>Ashcroft</u> v. <u>Iqbal</u>, 556 U.S. 662 (2009). We see no reason to do so or to address what is a hypothetical argument. The plaintiffs' case against the supervisors simply is insufficient to meet this circuit's standards as articulated before and reinforced after <u>Iqbal</u>.

There are a number of clear rules governing supervisory liability under § 1983. First, the subordinate's behavior must have caused a constitutional violation, although that alone is not sufficient. <u>See</u>, <u>e.g.</u>, <u>Welch</u> v. <u>Ciampa</u>, 542 F.3d 927, 937 (1st Cir. 2008); <u>Sanchez</u> v. <u>Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996). Here, there is a jury verdict establishing Pagán's and the other two officers' violation of constitutional rights.

Additionally, the tort theory of respondeat superior does not allow imposition of supervisory liability under § 1983. <u>See</u>, <u>e.g.</u>, <u>Grajales</u> v. <u>P.R. Ports Auth.</u>, 682 F.3d 40, 47 (1st Cir. 2012). Proof that the supervisors were negligent is also insufficient. <u>See</u>, <u>e.g.</u>, <u>Ramos</u> v. <u>Patnaude</u>, 640 F.3d 485, 490 (1st Cir. 2011); <u>Febus-Rodriguez</u> v. <u>Betancourt-Lebron</u>, 14 F.3d 87, 92 (1st Cir. 1994) ("[A] supervisor cannot be held liable for merely negligent acts."). Further, § 1983 liability cannot rest solely on a defendant's position of authority. <u>Ocasio-Hernández</u> v. <u>Fortuño-Burset</u>, 640 F.3d 1, 16 (1st Cir. 2011) (citing <u>Ayala-Rodríquez</u> v. <u>Rullán</u>, 511 F.3d 232, 236 (1st Cir. 2007)).

After Iqbal, as before, we have stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation.  See Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) ("[A] supervisor may not be held liable for the constitutional violations committed by his or her subordinates, unless there is an affirmative link between the behavior of a subordinate and the action or inaction of the supervisor . . . such that the supervisor's conduct led inexorably to the constitutional violation." (alterations in original) (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011)) (internal quotation marks omitted)).  The showing of causation must be a strong one, as that requirement "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation."  Hegarty v. Somerset Cnty., 53 F.3d 1367, 1380 (1st Cir. 1995) (emphasis added).

In addition, the supervisor must have notice of the unconstitutional condition said to lead to the claim.  Feliciano-Hernández, 663 F.3d at 533 ("[T]he plaintiff must show that the official had actual or constructive notice of the constitutional violation." (quoting Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 768 (1st Cir. 2010)) (internal quotation marks omitted)); id. at 535 ("Actual or constructive knowledge of a rights violation is a prerequisite for stating any claim.").

A plaintiff may prove causation by showing a "known history of widespread abuse sufficient to alert a supervisor to ongoing violations." Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576, 582 (1st Cir. 1994). However, proof of that sort must truly show "widespread" abuse; "isolated instances of unconstitutional activity ordinarily are insufficient . . . to show deliberate indifference." Id.

Turning from causation to what it means to be deliberately indifferent, we have typically formulated the deliberate indifference inquiry as a three-part test that requires plaintiffs to show: (1) "that the officials had knowledge of facts," from which (2) "the official[s] can draw the inference" (3) "that a substantial risk of serious harm exists." Ruiz-Rosa v. Rullán, 485 F.3d 150, 157 (1st Cir. 2007) (alteration in original) (quoting Calderon-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 65 (1st Cir. 2002)) (internal quotation marks omitted); see also Bowen v. City of Manchester, 966 F.2d 13, 17 (1st Cir. 1992).

B.      Application of Supervisory Liability Standards

The strongest of the plaintiffs' arguments[9] depends on

_____

[9] We dispose quickly of a side argument. The plaintiffs have not pointed to any evidence of "widespread" abuse that would have alerted the supervisors to "ongoing" systemic constitutional violations. See Maldonado-Denis, 23 F.3d at 582. The plaintiffs' evidence centers entirely on the Cáceres shooting and the officers involved with it. Without evidence of "widespread" abuse and "ongoing" constitutional violations, the plaintiffs' case cannot survive summary judgment on a systemic abuse theory. See id.; see also Estate of Bennett v. Wainright, 548 F.3d 155, 178 n.7 (1st

the theory that Pagán's disciplinary record, especially as to the substantiated complaints of domestic violence, should have led the supervisory defendants to have knowledge of facts from which they would have inferred that Pagán posed a substantial risk of doing serious harm to others. This should have prompted them to take action, other than what they did do, to prevent such harm. The plaintiffs also build on this central claim by alleging that various defendants were deliberately indifferent to the PRPD's inadequate procedures for reviewing and disseminating disciplinary records. If Pagán's disciplinary record was insufficient on causation -- that is, if it was not sufficient to put the supervisory defendants on notice of substantial risk of serious harm to others -- then these allegations about inadequate procedures are beside the point.

The plaintiffs also make some weak claims unrelated to Pagán's disciplinary record. They allege there were insufficient procedures for reviewing officer-involved shootings. But, as the plaintiffs' expert explained, neither Pagán nor the two other officers at the scene had shot anyone before and so the causal link fails. To the extent the plaintiffs show there was an unrelated shooting elsewhere that Pagán had witnessed roughly a week before,

Cir. 2008) (holding evidence insufficient to qualify as widespread under Maldonado-Denis when plaintiff produced evidence that officer who fatally shot mentally ill victim had previously shot another mentally ill individual).

-24-

there was no causal relationship to Pagán's shooting in entirely different circumstances on August 11, 2007.

1.    Claimed Deliberate Indifference to Pagán's Disciplinary Record

Pagán's disciplinary record evidenced seven instances of alleged misconduct over a nearly fourteen-year period. That record was not sufficient to put supervisors on notice that he presented a "substantial," "unusually serious," or "grave risk" of shooting an arrestee. See Ruiz-Rosa, 485 F.3d at 157; Figueroa-Torres v. Toledo-Dávila, 232 F.3d 270, 279 (1st Cir. 2000); Bowen, 966 F.2d at 17; accord Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998). Nor did it give notice he required discipline beyond that already given to him.

We do not discount the seriousness of the domestic violence allegations. We think the commission of these acts by Pagán against his girlfriend is indeed relevant to whether Pagán could be thought to pose a threat of violence to others when he was on official duty. We disagree with the proposition that private domestic abuse is not relevant to the risk of an officer abusing his public position with violence. Nonetheless, in light of all of the facts here, the causal connection the plaintiffs attempt to draw is insufficient as a matter of law to impose supervisory liability even on those supervisors who knew of the content of Pagán's disciplinary record, much less on those who did not know.

The domestic abuse events took place in 1998, nearly nine years before the shooting. The complaint about them was handled seriously by the PRPD. The PRPD investigation found that Pagán had made verbal threats and made threats using his weapon, but did not find he had acted on those threats or inflicted physical harm on others, much less used his weapon to shoot anyone. Further, Pagán was promptly sent for evaluation by the Domestic Violence unit, his firearm was taken away, and he was suspended. Once Pagán and the complainant's relationship ended, there were no other domestic abuse complaints filed against Pagán. Importantly, while Toledo-Dávila had recommended termination based only on the pre-hearing allegations, that recommendation was not deemed suitable after Pagán was given a hearing. Indeed, Toledo-Dávila said the evidence at the hearing compelled that reduction of the discipline to a suspension for a period of time. Pagán did receive significant discipline after the hearing: a sixty-day suspension without pay. A reasonable official would think that suspension would have a deterrent effect. Indeed, the handling of the charges in a serious manner seemed to have that effect, for there were no other domestic abuse claims made against Pagán after the charges were brought. This evidence is simply insufficient to show the needed causal relationship between the 1998 domestic abuse complaint and the August 11, 2007 shooting. Even after thoroughly investigating the complaint, the PRPD Superintendent did not conclude that the events

showed that Pagán was too dangerous to be in a position in which he would encounter civilians.  The record does not evidence any causal link between the two events.

Only a single other item in Pagán's record -- a complaint about assaulting a motorcyclist in 2004 -- revealed any additional potential tendency of violence toward civilians.[10]  But the record does not show that this complaint was substantiated in any way, nor does it give any information about the contents of the complaint.

These instances simply do not rise to the level of a "substantial" or "unusually serious" risk of shooting a civilian that the case law demands.  Cf. Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 49 (1st Cir. 1999) (finding deliberate indifference to grave risk of violence based on disciplinary record including thirty incidents of abuse of power, unlawful use of force, or physical assault, with six incidents generating recommendations of expulsion).  In contrast to the grave risk presented in Barreto-Rivera, the disciplinary record here showed no prior incidents of Pagán's assaulting arrestees or shooting his weapon unjustifiably, across more than a decade of Pagán's police service.

---

[10] The dissent counts four "particularly violent" episodes of misconduct in Pagán's file, presumably counting each of the three domestic violence incidents separately and ignoring the fact that the allegations regarding the motorcyclist were not substantiated. But parsing out the individual events would have been impossible for the two supervisors the dissent would hold liable, since, as the plaintiffs themselves argue, the disciplinary file did not include the underlying facts of the prior incidents.

Without such a record, the supervisory defendants cannot be said to have ignored a grave risk of harm.[11] The remaining theories of liability largely depend on the assertions that the supervisory defendants' failure to take action based on Pagán's disciplinary record met the causation requirement, which we have rejected.

### 2. Insufficient Procedures for Reviewing Disciplinary Records

The plaintiffs next argue that Sgt. Figueroa-Solis's failure to review Pagán's record at the time Pagán joined the TOD was causally related to the shooting, that lower-level supervisors frequently failed to review disciplinary records at the relevant times, and that the records did not contain enough information to allow lower-level supervisors to meaningfully review their subordinates' records.[12]

---

[11] The dissent expresses concern that our ruling allows the police a "free bite at the apple." Not so. A supervisor who has knowledge of and deliberately ignores a subordinate's history of violent events may well be liable for that subordinate's later violent acts, even if they are of a different kind than the past acts. What distinguishes this case is not the fact that Pagán's disciplinary record showed off-duty domestic violence rather than assaulting a civilian while on duty. Rather, it is the fact that the single domestic violence complaint on this record -- which was from nearly nine years before the shooting, was meaningfully investigated, led to meaningful sanctions, and was followed by no repeat behavior -- is far from sufficient to establish that Pagán had the "violent tendencies" the dissent ascribes to him, or to establish that his supervisors should have known he posed a "grave risk" of violence toward civilians in 2007.

[12] The dissent assumes that a proper review of the disciplinary files would have revealed that Pagán was unfit for duty, ignoring the plaintiffs' own argument that the files did not include enough information to allow lower-level supervisors to make that

-28-

These alleged errors plainly fail on the causation prong, and so we need not decide whether this theory is actually one of a constitutional violation. Even if Sgt. Figueroa-Solis had reviewed Pagán's file at the appropriate time, the file would not have demonstrated that Pagán had a proclivity for violence or was unfit for duty. It is true that a policy change instituted by Toledo-Dávila removed the details of the offense from the file memoranda imposing the disciplinary measures. But this policy change itself creates no liability with respect to Toledo-Dávila. That argument, which the plaintiffs have not substantially developed, fails on the substantial risk prong. The plaintiffs have produced no evidence to show that this policy created a substantial risk of subordinate officers' violating the constitutional rights of arrestees.

The plaintiffs argue that the PRPD's failure to punish seriously Pagán's past disciplinary violations amounted to supervisory condonation of his practices. But there is no showing he posed a substantial risk, much less that his suspension was inadequate to the offense. The plaintiffs' argument also fails because it depends on the inference that insufficient sanctioning

---

determination. Moreover, to the extent that the dissent argues that a more thorough review would have found Pagán unfit for service on the Impact Unit in particular -- as appears to be the dissent's primary complaint against Sgt. Colón-Báez -- the dissent never explains how the decision to place Pagán on the Impact Unit was causally related to the shooting.

for past problems led Pagán to believe that he could get away with more bad acts -- literally, murder. Under Febus-Rodriquez v. Betancourt-Lebron, 14 F.3d 87 (1st Cir. 1994), that argument cannot save the plaintiffs' case. See id. at 94 (explaining that it is "simply too tenuous" to draw an inference that "because Officer Rodríguez had not been sanctioned with respect to [his past] five [disciplinary] incidents, he believed he could get away with anything, including assaulting Febus"). More direct proof of causation is needed, and the record provides none.

3. Insufficient Procedures for Reviewing Officer-Involved Shootings

The plaintiffs next argue that the supervisory defendants did not ensure that sufficient procedures were in place for reviewing officer-involved shootings. This argument does not turn on Pagán's personal characteristics but is generic.

The plaintiffs urge us to infer that, had Pagán and his companions known that a meaningful investigation would follow any shooting they might commit, Pagán would have been less likely to shoot Cáceres. The plaintiffs sharpen this theory by arguing that if more had been done about another shooting, which they argue Pagán witnessed, that would have deterred him from shooting Cáceres. On August 5, 2011, the week before Pagán's shooting of Cáceres, Pagán and Sustache were on duty at a youth festival at which another officer shot a 21-year-old several times, killing him. The plaintiffs allege that Pagán witnessed that shooting but

was not interviewed in any subsequent investigation.  This theory twice fails: it tries to prove causation using only negligence, and the causal link between that negligence and the Cáceres shooting is entirely speculative.  We have already held that such a theory, even on much stronger facts, was "simply too tenuous" to support recovery.  Febus-Rodriguez, 14 F.3d at 94.

## IV.

We next turn to the supervisory defendants' appeal of the district court's denial of their earlier motion to dismiss plaintiffs' § 1983 claims for qualified immunity.

The summary judgment in defendants' favor moots the qualified immunity issue.  We decline to offer a hypothetical opinion on the qualified immunity issue in this case.

## V.

For the foregoing reasons, the district court's grant of summary judgment, at issue in No. 13-1169, is affirmed.  The appeal in No. 11-2339 is dismissed.  No costs are awarded.

So ordered.

- Dissenting Opinion Follows -

**TORRUELLA, <u>Circuit Judge</u>, concurring in part, dissenting in part.**  Considering the evidence on record, and drawing all reasonable inferences in favor of the non-moving plaintiffs, I believe the majority judges are incorrect in affirming the grant of

summary judgment as to all supervisory defendants.  Though a close call, I find there are questions of material fact regarding the supervisory liability of Cruz-Sánchez and Colón-Báez that have improperly been kept from a jury.[13]

Specifically, I believe there are questions of fact on whether officers Cruz-Sánchez and Colón-Báez were on notice of Pagán's seriously violent tendencies.  I also believe it should be up to a jury to determine whether the failure of these supervisory officers to take any measures to prevent or at least mitigate the grave risk that Pagán posed to the constitutional rights of others is causally related to the shooting death of Cáceres.  Accordingly, I respectfully dissent.

## I. Background

Review of a district court's grant of summary judgment is de novo.  Euromodas, Inc. v. Zanella, Ltd., 368 F.3d 11, 16 (1st Cir. 2004).  In conducting this review, we draw all reasonable inferences in favor of the non-moving party.  Collazo v. Nicholson, 535 F.3d 41, 44 (1st Cir. 2008).  "Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id.

A. Pagán's record and appointment to the TOD and the IU

---

[13]  I agree with the majority's opinion as to the remaining defendants on appeal.

Prior to fatally shooting Cáceres, Pagán had seven complaints on his PRPD disciplinary record. These included a complaint for insubordination, one for domestic violence, and one for assault on a motorcyclist. The latter was, however, found to be unsubstantiated by the PRPD. The plaintiffs have provided some form of proof for each of the seven complaints.

The plaintiffs' argument rests in large part on the domestic violence complaint, filed by Pagán's then girlfriend, which itself encompassed three acts of serious violence and police impropriety by Pagán in 1998. In the first incident, Pagán struck his girlfriend and, while brandishing his firearm, threatened her with death. In the second incident, Pagán visited his girlfriend's home carrying a gun he had taken from an arrestee. He brandished the gun and swore he would kill the arrestee whom the weapon belonged to. He then stored the weapon at his girlfriend's apartment for a few days. Finally, after their relationship had ended, Pagán stormed into his ex-girlfriend's apartment and once again assaulted and threatened her.

The PRPD's investigation of the domestic violence complaint filed by Pagán's girlfriend began in 1998. Pagán did not receive a sanction, however, until August 2004, when then Superintendent Agustín Cartagena ordered his expulsion from the force. While the order of expulsion against Pagán was pending, Cruz-Sánchez promoted Pagán to the Humacao Tactical Operations

Division ("TOD"). Cruz-Sánchez was Director of the TOD at the time. The TOD is a specialized team of "elite" officers within the PRPD who receive additional training for particularly sensitive situations. Cruz-Sánchez did not assess Pagán's disciplinary history before promoting Pagán to the TOD.

In early 2005, defendant Toledo-Dávila took on the job of Superintendent, and in December 2005, he reissued Pagán's order of expulsion. After Pagán sought internal administrative review of this sanction, Toledo-Dávila reduced his punishment to a sixty-day suspension without pay. Colón-Báez served Pagán the suspension papers.

Pagán served his suspension from August 23 to October 22, 2006. At that time, Cruz-Sánchez was still Director of the TOD, with Colón-Báez as Assistant Director. Upon completion of his suspension, Pagán immediately rejoined the TOD. Though PRPD regulations require that officers coming back from suspension be sent initially to Replacement Centers, none of the supervising officials took any action to transition Pagán back into service. In January 2007, shortly after Pagán served his suspension, Cruz-Sánchez evaluated Pagán and gave him stellar reviews. He admits he did so without reviewing Pagán's disciplinary file, or otherwise investigating his disciplinary history. This evaluation was seven months before the shooting of Cáceres.

A few months later in the summer of 2007, defendant Rivera-Merced, a high ranking PRPD official, sought to create a specialized Impact Unit ("IU") within the TOD, for intervention in high crime areas.  Cruz-Sánchez developed the operational plan for the IU, and Colón-Báez hand-picked Pagán for the unit; Pagán was again promoted.  Neither Cruz-Sánchez nor Colón-Báez reviewed Pagán's disciplinary file or otherwise probed his disciplinary background before accepting Pagán into the IU.

B. <u>The murder of Cáceres and the immediate aftermath</u>

I will spare the details of Cáceres's execution.  Suffice it to say that the shooting was caught on video and the circumstances surrounding it are not in dispute.

Immediately after the murder of Cáceres, Pagán and the two other defendant line officers who were present at the shooting left for Ryder Hospital nearby in Humacao.  The first to arrive on the scene of Cáceres's murder was Detective Rodríguez, who is not a party to this suit.  After speaking to a number of witnesses, Detective Rodríguez described the incident to Cruz-Sánchez, apparently over the phone or radio.  Cruz-Sánchez was the highest ranking officer in the Humacao area that evening. Detective Rodríguez told Cruz-Sánchez that he had no doubt the officers had abused their power.  Detective Rodríguez prepared a report of the incident, essentially relaying that Pagán shot Cáceres four times

while the latter lay on the ground, and expressing his view that the use of deadly force was entirely uncalled for.

Meanwhile, as Detective Rodríguez was investigating the scene of the crime, Cruz-Sánchez joined Pagán at Ryder Hospital. Colón-Báez, even though he was not on duty that evening, also joined Cruz-Sánchez and Pagán at the hospital.

As Cruz-Sánchez spoke to Pagán and the other defendant line officers for their version of events, other eyewitnesses of the shooting began to arrive at the hospital and offered their own account of what had transpired: that Cáceres had been shot dead while lying defenseless on the floor. By this time, Detective Rodríguez had already apprised Cruz-Sánchez that an act of police brutality had occurred.

Notwithstanding clearly contradictory accounts from other eyewitnesses, the report that resulted from information retold by Cruz-Sánchez and Colón-Báez, adopted the version of Pagán, his companion officers and that of an Héctor Huertas, the only bystander identified by name in the report, and, coincidentally, the only witness who gave a view of the events that was favorable to Pagán. As to the numerous accounts unfavorable to the officers, the report merely notes that "several persons, were interviewed at the scene" who "provided information that was adverse and against the agents." A few days later, Cruz-Sánchez himself added information to the report related to the identity of witness Héctor

Huertas and noted that the latter's version coincided in part with that of Pagán. Cruz-Sánchez noted that this corroboration compelled him to believe Pagán's version of the incident: that Cáceres had turned violent, attempted to wrestle his gun from him, and "several shots were fired" in the skirmish that ended in Cáceres's death.

The accuracy of Cruz-Sánchez's report of the events of August 11, 2007 came under serious doubt shortly thereafter when, thanks to a bystander who video-recorded the incident, the execution of Cáceres was aired on the evening news a few days later.

C. PRPD General Order 87-14

PRPD General Order 87-14 ("G.O. 87-14") requires officials in supervisory positions to examine the personnel file of each and every officer under their supervision. According to G.O. 87-14, supervisors must assess whether an officer in their unit is of violent character or holds the potential to commit civil rights violations. A supervisor must make this independent assessment whether or not there are substantiated complaints against the officer. G.O. 87-14 mandates that prior conduct of, and complaints against, the officer must be assessed in light of the underlying facts of the incident, and not on the ultimate result of the complaint.

## II. Discussion

A supervisory official may be found liable under 42 U.S.C. § 1983 for actions of his own that result in violations of constitutional rights by a subordinate. Camilo-Robles v. Hoyos, 151 F.3d 1, 6-7 (1st Cir. 1998). A supervisor "may be liable for the foreseeable consequences of such conduct if he would have known of it but for his deliberate indifference or willful blindness." Maldonado-Denis v. Castillo-Rodríquez, 23 F.3d 576, 582 (1st Cir. 1994). To prevail on a theory of deliberate indifference, "a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." Figueroa-Torres v. Toledo-Dávila, 232 F.3d 270, 279 (1st Cir. 2000) (internal quotation marks omitted). Liability does not attach on a showing of deliberate indifference alone, however; there must be an affirmative link between the subordinate's misconduct and the action, or inaction, of supervisory officials. See Id. This causal connection "need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct." Hoyos, 151 F.3d at 7 (citing Maldonado-Denis, 23 F.3d at 582 (explaining that the supervisor must have "had the power and authority to alleviate [the violation]")).

To be sure, both Cruz-Sánchez and Colón-Báez dispute some aspects of plaintiffs' version of the facts. All the more reason to conclude that, on this record, summary judgment in favor of Cruz-Sánchez or Colón-Báez was inappropriate.

As to their knowledge -- deemed or otherwise -- of Pagán's violent tendencies, there is arguably some dispute as to whether G.O. 87-14 had been suspended, and when exactly this suspension might have happened. Cruz-Sánchez testified, however, that as a supervisor he was responsible for reviewing the disciplinary files of officers under his supervision. This is consistent with the testimony of defendant Superintendent Toledo-Dávila, who stated that all supervisors were charged with the responsibility of reviewing subordinates' personnel files. Colón-Báez claims that he had no access to Pagán's disciplinary file, though there is also some dispute as to that. These questions turn on an assessment of credibility and, accordingly, are best left for the jury to answer.

Moving on to the pudding, one defendant at a time, Cruz-Sánchez was a lieutenant and former Director of the TOD, and he personally promoted Pagán to the TOD in 2004. At that time, there was a pending expulsion order against Pagán. Though plaintiffs dispute the claim, Cruz-Sánchez claims he was unaware of the pending expulsion order. Cruz-Sánchez did admit that, though he was required to do so, he did not review Pagán's disciplinary file.

Even assuming that he did not know the nature or the extent of the violations that led to Pagán's pending expulsion order, that G.O. 84-17 required him to review Pagán's file -- a requirement he admittedly knew of -- should have compelled him to review the file. It is clearly a question for the jury whether this circumstance is deemed to put Cruz-Sánchez on notice of Pagán's violent character.

Later, Cruz-Sánchez again had the opportunity to keep Pagán from a position where he posed a danger to civilians, but remained idle. In October of 2006, upon completion of a sixty day suspension, Cruz-Sánchez took Pagán right back into the TOD.[14] He again neglected to review Pagán's disciplinary file, despite the fact that he was aware that Pagán had just served a considerable sanction. Two to three months later in January 2007, again neglecting to review Pagán's file or otherwise inquire into his disciplinary history, Cruz-Sánchez evaluated Pagán and gave him stellar reviews, with high marks on the category of self-control. Seven months later, Cáceres lay dead on the ground. In fact, Cruz-Sánchez had perhaps one more opportunity to take action. And it

---

[14] The majority judges contend that it was Rivera-Merced's decision to accept Pagán back into the TOD immediately following his suspension, and not Cruz-Sánchez's. Rivera-Merced -- who also claims ignorance of Pagán's disciplinary history -- as Commander of the Humacao area had the authority to assign Pagán to any position within the Humacao area. There is no evidence, however, that Rivera-Merced actually ordered that Pagán be accepted back on the TOD. More importantly, that Rivera-Merced was higher up the hierarchical ladder did not relieve Cruz-Sánchez of his own duty, as Director of the TOD, of screening recruits and forming his own assessment of their suitability for service in the TOD.

may have come in the Summer of 2007 when Cruz-Sánchez designed the plan for the IU, a specialized squad within the TOD, and Colón-Báez chose its members, and Pagán was allowed to join.  But again, no effort was made to investigate Pagán's disciplinary history.

It is up to the jury to consider Pagán's return to the TOD and shortly thereafter his promotion to the IU, closely following a suspension, all at the behest of Cruz-Sánchez, who oversaw these decisions and afforded Pagán glowing reviews, without even glancing at his disciplinary record, much less investigating the reasons for his suspension.  Sub par, pro forma evaluations in particular concerned us in Gutierrez-Rodríguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989), when the supervisory defendant in that case gave favorable reviews to an officer that had ten complaints against him, including some episodes of violence.  Id. at 563, 582.

Colón-Báez presents a more egregious case than Cruz Sánchez.  Colón-Báez personally selected Pagán for the IU, knowing full well of Pagán's violent past; he personally served Pagán with his suspension papers and admitted knowing that the sanction was the result of domestic violence.  Notwithstanding this fact, Colón-Báez chose not to investigate Pagán's disciplinary history, which would have uncovered several episodes of misconduct, including a few particularly violent ones, and selected Pagán for the IU on a whim.

The majority contends that there is no evidence of Colón-Báez's knowledge of Pagán's violent past. Though the extent of Colón-Báez's knowledge is arguably disputed, there is no question that he was aware that Pagán served a considerable suspension for an episode of domestic violence. Furthermore, had he probed the matter, as he was required to do, he would have discovered that Pagán had battered his ex-girlfriend and threatened her with death while brandishing his firearm.

As to Colón-Báez, a rational jury could conclude that he relied on no criteria for selecting prospective members of the IU, and in Pagán's case in particular, declined to review his personnel file or assess his disciplinary background. I stress that Colón-Báez's inaction is particularly objectionable given that it is undisputed that he was aware that Pagán faced disciplinary action due to violent conduct. A rational jury could easily conclude that awareness of Pagán's suspension should have, at the very least, put him on notice of Pagán's violent character.

The majority also takes the position that review of Pagán's disciplinary file would not have uncovered much of his violent past. This is so, they contend, because at some point during his tenure as Superintendent, Toledo-Dávila limited the information contained in disciplinary orders by removing the factual details underlying complaints, and listing only the sanction. This, however, does not provide shelter to Cruz-Sánchez

or Colón-Báez.  A change in the format of disciplinary orders did not relieve either supervisor of his duty to ascertain whether or not officers under their supervision presented a danger to the civil rights of citizens.  Both G.O. 87-14 and the testimony of Toledo-Dávila regarding the duty of supervisors to assess their subordinates' character bolster this proposition.  Furthermore, as Cruz-Sánchez himself admitted, both he and Colón-Báez could have easily accessed whatever information was pertinent to Pagán's suspension, which they were both aware of, merely by requesting it.

I am concerned by the majority's view that Pagán's disciplinary history was not enough to put the supervisory officials on notice that he presented a substantial risk of shooting an arrestee or civilian.  Underlying this finding is the notion that, in order for liability to attach on a deliberate indifference theory, our case law requires that supervisory officials be on notice, not merely of the potential for violence on the part of the subordinate, but of the potential of a specific act of violence, in this case, shooting a civilian.

To be sure, the Supreme Court has provided guidance to the effect that there must be warning of a specific kind of injury. See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 412 (1997)("[A] finding of culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury.  Rather it must depend on a

finding that this officer was highly likely to inflict the particular injury suffered by the plaintiff.") (emphasis omitted). However, if a subordinate's threats of death by gunfire against another person are not enough to put a supervisor on notice that the subordinate is a prime prospect for engaging in such conduct in the future, is it required that his supervisors wait until the subordinate actually commits such a crime before corrective or preventive measures are taken?  Such a strenuous standard cannot possibly be the law.  In the case of Pagán, after one episode of executing a civilian, it seems obvious now that he is an ideal candidate for supervisory action based on his proven record.  For Cáceres, it was one shot too many.

Accordingly, out of an abundance of caution, I reject any reading of the case law that approaches affording defendants one free bite at the apple.  Though in an Eight Amendment context, our case law has actually disavowed the idea -- which would essentially amount to requiring clairvoyance -- that too much specifics are required.  See Ruiz-Rosa v. Rullan, 485 F.3d 150, 157 (1st Cir. 2007) ("[P]roof of deliberate indifference by prison officials does not require evidence that the officials were aware of the risk of a specific harm.").  I think we've avoided such a rule for good reason.

I concede that whether the causal connection here is sufficient, is a close question, particularly as to Cruz-Sánchez.

-44-

I understand it may seem a stretch to some, at first glance, that a few violent episodes in 1998 would somehow be linked to another violent episode in 2007. However, it is in part because this is a difficult question that I believe the majority errs in not allowing the jury to fulfill its traditional function. Young v. City of Providence, 404 F.3d 4, 23 (1st Cir. 2005) ("[Q]uestions of proximate cause are generally best left to the jury."). Though Pagán's most egregious acts of violence happened years before the murder of Cáceres, the disciplinary proceedings related to those acts did not conclude until eight years later, in October 2006, when Pagán served his suspension only months before the execution.[15]

A reasonable jury could conclude that Cruz-Sánchez and Colón-Báez had several opportunities throughout these years to take action to prevent harm to civilians on behalf of Pagán, and failed to act up until 2007. Not an unlikely possibility, given that, only months later, he would carry out the murder he had threatened against at least two other people in the past, and took Pagán's life.[16]

---

[15] Respectfully, I find improbable the majority's belief that the PRPD handled the complaints against Pagán in a serious manner. The mere fact that eight years elapsed before Pagán received a final sanction makes that procedure seem, frankly, laughable. Moreover, in most jurisdictions I am aware of, assault and battery with a deadly weapon carries a sentence of incarceration. Thus, a sixty day suspension seems quite insubstantial as an administrative sanction for essentially the same conduct.

[16] The majority cites to Barreto-Rivera v. Medina-Vargas, 168 F.3d 42 (1st Cir. 1999), in support of its finding that Pagán's

## III. Conclusion

A jury should have the opportunity to determine whether Cruz-Sánchez and Colón-Báez were on notice of the risk of harm Pagán posed to civilians. It should also have the occasion to determine whether either defendant should have seized any of the opportunities they had to keep Pagán from acting out and repeating his violent tendencies. I believe a reasonable jury could answer both inquiries in the affirmative. A claim of ignorance cannot shield them from liability. In fact, such a claim might be probative of deliberate indifference. Accordingly, for these reasons, I dissent.

---

disciplinary file was not substantial enough to alarm his supervisors that he posed a grave risk of harm. In Barreto-Rivera we found sufficient evidence to conclude that a supervisory official was deliberately indifferent to, among other things, a disciplinary history more extensive than Pagán's. Id. at 49. The principal defendant in Barreto-Rivera had also shot and killed a civilian after a personal altercation. The brunt of our analysis in Barreto-Rivera turned on the question of whether the principal defendant was acting under color of state law. Id. at 46-48. We also found a causal nexus to the supervisory official's omissions because there was a "known history of widespread abuse" as evinced by the principal defendant's extensive disciplinary record. Id. at 48-49. I note however, that Barreto-Rivera did not set a floor or a ceiling for disciplinary records on the question of what amounts to notice of a risk of harm.